**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4835**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KEITH WILLIE REED,

Defendant - Appellant.

**No. 13-4836**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STANLEY RAY WINSTON, a/k/a Stanley Wilson, a/k/a Rashaad Winston,

Defendant - Appellant.

**No. 13-4837**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY CANNON,

                    Defendant - Appellant.

                        _____

                        **No. 13-4839**
                        _____

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

TOBIAS RICHARD DYER,

                    Defendant - Appellant.

                        _____

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria.   Claude M. Hilton, Senior
District   Judge.     (1:13-cr-00048-CMH-1;   1:13-cr-00048-CMH-2;
1:13-cr-00048-CMH-3; 1:13-cr-00048-CMH-4)

                        _____

Argued:  December 11, 2014          Decided:  March 11, 2015

                        _____

Before AGEE, DIAZ, and FLOYD, Circuit Judges.

                        _____

Affirmed by published opinion.  Judge Floyd wrote the opinion,
in which Judge Agee and Judge Diaz joined.

                        _____

**ARGUED:** Melinda VanLowe, LAW OFFICE OF MELINDA L. VANLOWE,
Fairfax, Virginia; Lawrence Hunter Woodward, Jr., SHUTTLEWORTH,
RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia;
Alfred Lincoln Robertson, Jr., ROBERTSON LAW OFFICE, PLLC,
Alexandria, Virginia; Abram John Pafford, PAFFORD, LAWRENCE &
CHILDRESS, PLLC, Lynchburg, Virginia, for Appellants.  Rebeca
Hidalgo Bellows, OFFICE OF THE UNITED STATES ATTORNEY,
Alexandria, Virginia, for Appellee.  **ON BRIEF:** Dana J. Boente,
United States Attorney, Patricia T. Giles, Assistant United

                            2

States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

FLOYD, Circuit Judge:

Four masked men committed a string of robberies around Alexandria and Arlington, Virginia, in December 2012. During the third and final robbery, the thieves took $60,411.15 from a credit union. They also unwittingly took three GPS tracking devices embedded in the cash. The GPS devices led police to the four appellants in this case: Keith Reed, Stanley Winston, Anthony Cannon, and Tobias Dyer (collectively, "Appellants"). Appellants were ultimately convicted at a jury trial for multiple offenses. In this consolidated appeal, Appellants challenge the admission of certain evidence and claim that there is insufficient evidence to convict them for any of the charged crimes. For the reasons stated below, we affirm their convictions.

I.

At trial the government proffered evidence, viewed in the light most favorable to the government's case, that supports the following narrative. United States v. Hassan, 742 F.3d 104, 139 (4th Cir. 2014).

A.

At approximately 8:04 p.m. on December 7, 2012, three African American men entered the premises of VVM, Inc., a

4

business that sells cell phones and international phone cards in Alexandria, Virginia. When the men entered, a VVM employee was serving a customer. The men--wearing ski masks and brandishing firearms--ordered the employee and customer to the floor and demanded that they not move. After unsuccessfully trying to breach a closed Western Union office that shared the premises with VVM, the men grabbed approximately $800 from the VVM cash register. They then fled in a Jeep driven by a fourth accomplice. Police recovered a Jeep the next morning, approximately a half mile from the VVM store. The Jeep, which had been reported stolen, was damaged from a punched-in ignition, and the last four numbers of its license plate matched those provided by a witness to the VVM robbery.

Camera footage of the robbery, along with witness testimony, revealed that two of the robbers who entered VVM were tall (approximately six feet), while the third was shorter (approximately five feet, six inches). Two of the appellants-- Cannon and Dyer--are six feet tall, while Winston is shorter at approximately five feet, six inches. Moreover, all the appellants are African American.

Cell-phone records show that Appellants had called each other numerous times throughout the day of the robbery. There were no calls between them after 6:00 p.m., however, implying that they were together by that point. Phone records also show

5

Appellants had traveled to Alexandria by 6:30 p.m., were near VVM at 8:00 p.m., and had returned to their hometown of Washington, D.C., by 8:13 p.m. (just after the robbery), where they remained for the rest of the night.

B.

Two days later, on December 9 at approximately 6:30 a.m., three masked men brandishing firearms entered a Shoppers Food Warehouse in Alexandria, while a fourth man waited in a Jeep outside. The robbers who entered the store were African American, and again two of them were tall while the third was shorter. One tall robber climbed a wall into a manager's office, while the other two ordered employees and a customer to the ground while the robbers took money from cash registers. The robbers fled the store with $15,695. Later that day, some of the appellants used their phones to take pictures of stacks of cash and themselves celebrating at a club. Police found a stolen Jeep, which was also damaged from a punched-in ignition, a week later in D.C. In the Jeep's trunk, officers recovered cash tills containing receipts from the Alexandria Shoppers Food Warehouse.

Phone records again show that Appellants (primarily Dyer and Reed) made numerous calls to each other during the day of the robbery--this time in the early morning from midnight to

6

5:21 a.m.  These records also show that although Reed, Cannon, and Dyer were all in D.C. before 5:30 a.m., at least Reed and Cannon were in Alexandria and near the Shoppers Food Warehouse by 6:15 a.m.--only 15 minutes before the robbery.

## C.

Two weeks later, on December 22 at approximately 9:50 a.m., three masked men entered a Navy Federal Credit Union ("the Credit Union") in Arlington, Virginia, while a fourth waited in a Jeep outside.  Once again, two of the robbers were tall, the other short.  The short robber demanded money near the Credit Union's main entrance.  The tall robbers--one of whom had a semi-automatic handgun with a drum-style magazine--jumped over the teller counter.  One robber filled a trash can with money from the teller drawer, while another went to the Credit Union's vault, where he took money and cash bags.  The robbers fled with $60,411.15 and--unbeknownst to them--three GPS tracking devices hidden in the cash.  A stolen Jeep matching the description of the escape vehicle was found later, again damaged with a punched-in ignition.  In addition, the officers recovered a trash can in the Jeep's front passenger area, similar to one the Credit Union robbers had reportedly used to transport the stolen bags of money.

7

Phone records show that Dyer, Winston, and Reed called each other several times in the hours before the robbery. Although they were all in D.C. during the early morning, records show that at least Winston was in Arlington near the Navy Federal Credit Union by 9:32 a.m.--approximately 18 minutes before the robbery.

D.

Law enforcement tracked the GPS signals to an area in southeast D.C. A police officer canvassed the area for four to six males. The officer saw Appellants walking on the street. One of the men left the group to drop a blue bag--later found to contain a hoodie and ski mask--across the street and then returned to the group. The officer asked the group whether they lived nearby and requested that they present identification. Reed then fled into woods, and the others followed.

Additional police officers arrived and joined in the pursuit. The officers apprehended each appellant one by one. When the officers spotted Reed, he had a blue cell phone in his hand and appeared to be talking on it. Despite orders to keep his hands up, Reed kept dropping his hands. When officers approached, an officer saw the phone and a black ski mask near Reed. Another officer detained Reed and placed his belongings (including the cell phone) in a property bag, which was

8

transported to a police station.[1]  The police also transported a bag labeled "Dyer" containing an iPhone 5 to the police station, although at trial the government offered no testimony about how this phone was seized.  Officers found masks, money, and gloves strewn on the ground throughout the woods where Appellants were arrested.

After Appellants were apprehended, police found that the third GPS tracker was emitting signals from Cannon's residence. In that house, police found three ski masks, two pairs of black gloves, thousands of dollars in cash, the third GPS tracker, and three firearms (including one with a drum-style magazine).  In total, officers seized eight masks, which analysts found contained DNA consistent with Appellants' DNA.


E.

On April 23, 2013, a federal grand jury indicted Reed, Winston, Cannon, and Dyer on 12 counts stemming from the three robberies: conspiracy to commit Hobbs Act[2] robbery (Count 1); Hobbs Act robbery (Counts 2 through 4, for each robbery); armed robbery of a credit union (Count 5); using, carrying, and

_____

[1]  It was standard practice for officers to place an arrestee's personal effects in a property bag labeled with the arrestee's name.  FBI Special Agent Mark Hess later collected all the bags from the police station.
[2]  Hobbs Act, 18 U.S.C. § 1951.

brandishing a firearm during and in relation to a crime of violence (Counts 6 through 8, for each robbery); and being a felon-in-possession of a firearm (Counts 9 through 12, for each appellant). After a four-day trial, a jury convicted Appellants on all counts. Winston and Cannon filed separate motions for judgment of acquittal, which were denied. The district judge sentenced each of the appellants to 720 months (60 years) in prison.

## II.

Appellants contest their convictions on several grounds. First, they argue that the trial judge abused his discretion and violated the Federal Rules of Evidence by admitting certain evidence. Similarly, but separately, Dyer claims that admitting evidence recovered from his cell phone violated the Sixth Amendment because the government failed to offer any testimony establishing how the phone was seized. Finally, Appellants argue that there is insufficient evidence to sustain their convictions. We assess each argument below.

## A.

Appellants first challenge the trial court's admission of Exhibit 45, a collection of maps produced by the FBI Cellular Analysis Detail Team and proffered by the government at trial.

10

The FBI produced the maps using data from Appellants' cell phones and their service providers' cell towers. As explained at trial, a cell phone communicates with towers (usually the tower closest to the phone) when a person sends a text, makes or receives a voice call, or uses cellular data. Service providers record these communications. From these records, the FBI can extrapolate a probable area in which the phone was located over time. This process is known as a historical cell-site analysis. In this case, the cell-site analysis from Appellants' phone data placed at least one of the appellants near the scene of each robbery, close in time to when the robbery occurred.[3]

On appeal, Appellants challenge the government's use of their names, rather than phone numbers, when showing the phones' locations on the maps in Exhibit 45. For example, the map indicated that it was detailing Cannon's possible location at 8:12 p.m. on December 7, 2012, rather than showing the whereabouts of the phone associated with the number 202.510.4853. The government expert testified before the jury that this labeling would be erroneous for a certain defendant if

_____

[3] For example, Reed's phone data showed that he was in Washington, D.C. around 6:05 p.m. on December 7, 2012, but near Alexandria and the VVM store a mere 20 minutes later. His phone contacted a phone tower in Alexandria again around 8:04 p.m.-- the time of the robbery. A mere ten minutes after the robbery occurred, Reed's phone contacted a tower back in D.C., suggesting that he quickly returned to D.C. after committing the VVM robbery.

the defendant did not in fact possess the cell phone.  Although Appellants make several different arguments under the Federal Rules of Evidence for why the trial judge abused his discretion in admitting Exhibit 45, all the arguments lack merit.

### 1.

We review the trial court's admission of Exhibit 45 for abuse of discretion.  United States v. Mouzone, 687 F.3d 207, 216 (4th Cir. 2012).  In other words, we look to see whether the evidentiary ruling was "arbitrary and irrational."  Hassan, 742 F.3d at 130 (quoting United States v. Cole, 631 F.3d 146, 153 (4th Cir. 2011)).

### 2.

Appellants first argue that the government failed to authenticate Exhibit 45 under Rule 901(a) of the Federal Rules of Evidence.  See Fed. R. Evid. 901(a) ("[T]he proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").  A proponent can authenticate an item through various means, including "[t]estimony that an item is what it is claimed to be" or "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(1), (4).  "[T]he

12

burden to authenticate under Rule 901 is not high," as a "district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." Hassan, 742 F.3d at 133 (quoting United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009)).

Notwithstanding Appellants' assertion to the contrary, the district court did not violate Rule 901 by admitting Exhibit 45. The government provided adequate reason for the jury to believe (i) that phone data could be used to approximate the phones' location at pertinent times and (ii) that each phone number was associated with a certain appellant. First, as to providing a foundation for the technical aspects of the cell-site analysis, the government's expert, Agent Kevin Horan of the FBI Cellular Analysis Detail Team, detailed how he conducts a cell-site analysis and how it reveals the area in which a phone is likely located at a certain time. See J.A. 703-04, 710-18. This testimony provided a foundation for how the maps were created and allowed the jury to conclude that the maps reflected the phones' locations.

Second, the government proffered evidence that the jury could use to attribute each phone to one of the four appellants. The government tied the phone with number 202.339.9022 to Dyer through photos of Dyer on the phone and text messages

13

attributing the number to Dyer, including several that used variations on his first name, Tobias. See J.A. 650-52; S.J.A. 77 ("Tfoool"), 88 ("Tobb"), 120 ("UNCLE TOBYYY"), 123 ("Tobias"), 124 ("Tobias"), 125 ("Toby"), 127 ("Sup love dis Toby"), 131-70. The government tied 202.594.4127 to Stanley Winston through a text message that identified the owner as "Stanley" and testimony that Winston handled the phone at issue and assisted the officers in searching the phone. J.A. 481-82; S.J.A. 97. The government tied 240.355.8256 to Reed through testimony of Officer Harry Singleton, who said that he had seen Reed talking on the associated blue phone, which was recovered near where Reed was apprehended. J.A. 234-35, 237-38; see also J.A. 240-41 (describing how Reed's property was collected). And finally, the government tied 202.510.4853 to Cannon, despite no phone being found, through the labeling of that number in Winston's phone as "Cannon." See S.J.A. 93, 97. Based on this testimony and the phones' data, the government provided a foundation to authenticate each phone as belonging to a certain appellant. Thus, the trial court's admission of Exhibit 45 did not violate Rule 901(a).

3.

Second, Appellants argue that Exhibit 45 was irrelevant under Rule 401 of the Federal Rules of Evidence. Rule 401

14

provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The "fact" at issue here is whether Appellants committed the robberies. Put simply, Exhibit 45 shows Appellants' proximity to the scenes of the robberies close to the times the robberies occurred, as well as Appellants' respective proximity to one another on the days of the robberies. This evidence makes it more probable that they committed the robberies. Thus, Exhibit 45 was plainly relevant under Rule 401.

4.

Finally, Appellants argue that Exhibit 45 was unfairly prejudicial, confused the issues, and misled the jury under Rule 403 of the Federal Rules of Evidence. Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." We employ a "highly deferential" standard of review, in which a "decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." Hassan, 742 F.3d at 132

15

(quoting United States v. Udeozor, 515 F.3d 260, 265 (4th Cir. 2008)).

Appellants' argument is based on Exhibit 45 (i) purportedly not being drawn to scale and (ii) using Appellants' names rather the phones' numbers as labels. As to whether Exhibit 45's scale caused unfair prejudice or misled the jury, Appellants rely on bare conclusions. Thus, they have failed to show that the maps in Exhibit 45 were in fact not drawn to scale or that the scale caused any unfair prejudice.

Appellants' argument regarding the use of their names rather than the phones' numbers is somewhat stronger, but likewise without merit. As Appellants correctly note, for the labeling to be accurate, the jury was required to conclude that each appellant in fact possessed the phone attributed to him. Appellants argue that the use of names, not numbers, usurped the jury's prerogative to make this determination. The record, however, shows otherwise. Indeed, the government's expert and Appellants' counsel repeatedly noted at trial (i) that Exhibit 45 was not dispositive of whether Appellants in fact possessed the phones and (ii) that the use of names would be inaccurate if the government mistakenly attributed the phones to Appellants. See, e.g., J.A. 713, 715-18, 734-35, 742-45, 829-30, 835, 849. This testimony mitigated any likelihood of unfair prejudice, confusing the issues, or misleading the jury. Therefore, any

16

prejudice from using names rather than numbers does not substantially outweigh Exhibit 45's probative value, and the trial judge did not abuse his discretion in admitting the evidence.

B.

Appellant Dyer posits his own argument for why the trial court improperly admitted data retrieved from the cell phone attributed to him.[4] He argues that admitting this evidence violated the Sixth Amendment's Confrontation Clause because not everyone in the phone's chain of custody testified at trial. FBI Special Agent Mark Hess testified only that he took a bag-- labeled "Dyer"--of items found at the police station and used the contents to produce a case against Dyer and others. Dyer emphasizes that there was no testimony about who initially seized the phone and from where it was taken.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Evidence implicates the Confrontation

---

[4] Dyer also argues that the phone and its contents were not properly authenticated. As discussed in Part II.A of this opinion, however, this argument is without merit, as there was an adequate foundation for the jury to conclude that he used the phone.

17

Clause only if it constitutes a testimonial statement--that is, a statement made with "a primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011). If a statement's primary purpose is "not to create a record for trial," then the Confrontation Clause does not apply. Id. Even if a witness's statement is testimonial and the witness is absent from trial, however, the Confrontation Clause permits the statement's admission if (1) "the declarant is unavailable" and (2) "the defendant has had a prior opportunity to cross-examine." Mouzone, 687 F.3d at 213 (quoting Crawford v. Washington, 541 U.S. 36, 59 (2004)).

Although we review an alleged Confrontation Clause violation de novo, id., a violation may be found harmless on appeal if "the beneficiary of the constitutional error can prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," United States v. Williams, 632 F.3d 129, 133 (4th Cir. 2011) (brackets and ellipsis omitted) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). In finding harmless error, we need not hold that any error actually occurred; instead, we can assume error. United States v. Tyler, 943 F.2d 420, 423 (4th Cir. 1991). Indeed, we should avoid deciding whether there was a violation of the Confrontation Clause if any error was harmless, as "the principle of constitutional avoidance . . . requires the federal

18

courts to strive to avoid rendering constitutional rulings unless absolutely necessary." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156-57 (4th Cir. 2010).

We decline to address whether labeling the bag so as to attribute its contents to Dyer constituted a testimonial statement. Instead, we simply find that even if the statement was testimonial and there was error, any error was harmless beyond a reasonable doubt. In our view, even if the bag had not been labeled, the government could still connect the phone to Dyer based on its data, namely its stored photos and text messages, which demonstrated that he owned and possessed the phone. See supra Part II.A. Thus, assuming that there was a violation of the Sixth Amendment, it was harmless beyond a reasonable doubt.

C.

We next address whether the trial court correctly denied Appellants' motions for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. As explained below, there was sufficient evidence to convict Appellants on every charged offense.

19

## 1.

We review a district court's denial of a motion for judgment of acquittal de novo. Hassan, 742 F.3d at 139. "Applying that standard, it is well settled that 'the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it.'" Id. (brackets omitted) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)). Substantial evidence is that which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (quoting United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc)).

## 2.

Appellants deny that they committed any robbery and thus claim that they were wrongfully convicted on all the charged offenses. They emphasize that no witness of the robberies could identify them as the assailants. This purported hole in the government's case is unsurprising, however, given that the perpetrators used masks during the robberies. In any event, the evidence against Appellants that they committed the robberies is substantial, notwithstanding the lack of positive identification by eyewitnesses.

20

The strongest case against them is in regard to the third robbery. Within 30 minutes of the robbery at the Credit Union, the GPS devices hidden in the stolen cash guided officials to the area of D.C. where Appellants were found. Once confronted by an officer, Appellants fled into the woods. There, law enforcement found Appellants, two of the GPS devices, and cash and masks strewn on the ground. Then, in Cannon's home, law enforcement found the last GPS device, piles of cash, three firearms that matched witnesses' descriptions of the firearms used at the robbery, and additional masks. Through DNA evidence, law enforcement connected the recovered masks to Appellants. This evidence was more than enough to convict Appellants for the offenses related to the third robbery (Counts 1, 4, 5, and 8 through 12).

As to the first and second robberies, the evidence against Appellants is less overwhelming but nevertheless substantial. Evidence suggests that all three robberies involved a getaway driver, use of a stolen jeep, and three masked African Americans (one short and two tall) entering the businesses. True, these similarities could in theory amount to mere coincidences. But a reasonable jury could also fairly connect the first two robberies to Appellants based on (i) the substantial evidence that implicated Appellants in the third robbery, (ii) the substantial similarity between the third robbery and the first

21

two, and (iii) the close temporal and geographical proximity between all the robberies. Indeed, phone data buttressed the reasonableness of connecting the third robbery to the first two based on their similarities.

As to the VVM robbery on December 7, each appellant had at least 15 phone calls with co-conspirators on the day of the robbery, while they made no calls to each other within the two-and-a-half hours before the robbery. A reasonable jury could conclude that this suggests a great deal of coordination on the day of the robbery and that Appellants were with each other when the robbery was committed. Additionally, all the cell phones attributed to Appellants contacted towers in Alexandria--where the robbery occurred--in the few hours preceding the robbery. This evidence was enough for a reasonable jury to convict Appellants for the offenses related to the VVM robbery (Counts 2 and 6).

Phone data also connected Appellants to the Shoppers Food Warehouse robbery. Although there was less contact between Appellants than for the first robbery, the high number of early morning phone calls between Appellants was nevertheless significant. Moreover, phones associated with Cannon and Reed placed them in Alexandria near the time of the robbery. Lastly, the record contains numerous pictures of stacks of cash and celebration--pictures recovered from Appellants' phones and

22

taken within hours of the second robbery--that implicate Appellants.[5] Thus, as with the other robberies, the government proffered sufficient evidence for a reasonable jury to convict Appellants on the offenses related to the Shoppers Food Warehouse robbery (Counts 3 and 7).

3.

In addition to Appellants' general denial that they committed the robberies, they specifically challenge their convictions for the first robbery under the Hobbs Act, codified at 18 U.S.C. § 1951. This offense requires the government to prove "(1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the 'wrongful use of actual or threatened force, violence or fear or under color of official right'; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce." United States v. Buffey, 899 F.2d 1402, 1403 (4th Cir. 1990) (quoting United States v. De Parias, 805 F.2d 1447, 1450 (11th Cir. 1986)). Appellants challenge the sufficiency of the evidence in proving the third element--that is, they claim there was no

---

[5] We note that there is less evidence implicating Reed compared to his co-conspirators. Most notably, there was no conclusive eyewitness testimony about a getaway driver at the robberies. Nevertheless, the evidence against him was substantial and sufficient to sustain his conviction on all charged counts.

evidence that the first robbery adversely affected interstate commerce.

Notwithstanding Appellants' arguments to the contrary, the government established that VVM was the victim of the first robbery and that VVM's business affected interstate commerce. A VVM employee testified that he was selling an international phone card when the robbery occurred, that the robbers took money from his cash register, and that all other stores on the premises were closed at the time of the robbery. In other words, evidence showed that VVM conducted business in interstate commerce and that the business was interrupted by Appellants. Thus, we affirm Appellants' convictions under the Hobbs Act for the first robbery.

4.

Finally, Appellants challenge their convictions under 18 U.S.C. §§ 922(g)(1) and 924(c) by arguing that the government presented no evidence that the firearms found at Cannon's house traveled in interstate commerce or were used in the robberies. We find, however, that their convictions under each respective statute were proper.

24

a.

Counts 9 through 12 charged Appellants under 18 U.S.C. § 922(g)(1) with being felons in possession of a firearm. To prove a violation of § 922(g)(1), the government must prove beyond a reasonable doubt that:

> (1) the defendant previously had been convicted of a crime punishable by a term of imprisonment exceeding one year; (2) the defendant knowingly possessed, transported, shipped, or received, the firearm; and (3) the possession was in or affecting commerce, because the firearm had travelled in interstate or foreign commerce at some point during its existence.

United States v. Langley, 62 F.3d 602, 606 (4th Cir. 1995) (en banc). Appellants do not dispute that they are all convicted felons. Instead, they contest whether the government proffered sufficient evidence proving the second and third elements.

The convictions under § 922(g)(1) arose from the third robbery. Witnesses described the firearms used in this robbery as having unique features (such as a drum-style magazine) that matched features of the firearms found at Cannon's house. Based on the similarity of the firearms and their discovery in Cannon's house within hours of the robbery, a reasonable jury could conclude that the firearms were the same. The natural result of that conclusion is that the firearms traveled in interstate commerce by going from D.C. to Virginia and back. See 18 U.S.C. § 10 (defining "interstate commerce" as including

25

"commerce between one State" and "the District of Columbia");
United States v. Gould, 568 F.3d 459, 471 (4th Cir. 2009)
(noting that travel across a state line constitutes interstate
commerce). Although the government did not prove that each co-
conspirator actually held a firearm on December 22, their
constructive possession of the firearms is sufficient to support
a § 922(g)(1) conviction. United States v. Branch, 537 F.3d
328, 343 (4th Cir. 2008). As a result, a reasonable jury could
convict Appellants under § 922(g)(1).

b.

Counts 6 through 8 charged Appellants under 18 U.S.C.
§ 924(c) with possessing firearms in furtherance of a crime of
violence--that is, each of the three robberies. To prove a
violation of § 924(c), the government was required to "present
evidence indicating that the possession of a firearm furthered,
advanced, or helped forward a crime of violence." Hassan, 742
F.3d at 142 (quoting United States v. Khan, 461 F.3d 477, 489
(4th Cir. 2006)). "A defendant may be convicted of a § 924(c)
charge on the basis of a coconspirator's use of a gun if the use
was in furtherance of the conspiracy and was reasonably
foreseeable to the defendant." United States v. Wilson, 135
F.3d 291, 305 (4th Cir. 1998).

26

As discussed supra Part II.C.2, there was sufficient evidence for a reasonable jury to find that Appellants committed each robbery. The evidence shows that each robbery involved the use of a firearm. As a result, a reasonable jury could find that Appellants used a firearm in furtherance of each of the robberies, and their convictions for those charged offenses were proper.

## III.

For the aforementioned reasons, none of the challenges raised on appeal have merit, and we affirm Appellants' convictions.

AFFIRMED