**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4137**

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

v.

DONNA B. TALLEY,

            Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Mark S. Davis, Chief District Judge.  (4:16-cr-00021-MSD-RJK-1)

Argued:  December 13, 2018                                    Decided:  April 24, 2019

Before MOTZ, AGEE and RICHARDSON, Circuit Judges.

Affirmed by unpublished opinion. Judge Agee wrote the opinion, in which Judge Motz and Judge Richardson joined.

**ARGUED:**  Glenn Ivey, PRICE BENOWITZ, LLP, Washington, D.C., for Appellant. Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.  **ON BRIEF:**  David B. Benowitz, PRICE BENOWITZ, LLP, Washington, D.C., for Appellant.  Dana J. Boente, United States Attorney, Alexandria, Virginia, Megan M. Cowles, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Donna B. Talley raises multiple issues challenging her convictions for obtaining hydrocodone through fraud, possession with intent to distribute hydrocodone, and mail fraud. Specifically, she contends that the district court violated her Sixth Amendment right to counsel of choice, abused its discretion in allowing the Government to introduce certain evidence, and gave an incorrect Rule 404(b) jury instruction. In addition, she asserts that the evidence was insufficient to support a finding of fraud. For the reasons set forth below, we affirm Talley's convictions.

I.

Presented in the light most favorable to the Government, the trial evidence established the following facts. *See United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996) (en banc). Talley worked for almost four decades at Dr. Steven Becker's solo dental practice ("the practice") in Hampton, Virginia. The two had a close personal relationship, with Dr. Becker testifying that he viewed Talley "as [his] daughter." J.A. 554–55. Talley and Dr. Becker were the practice's only full-time employees. Her job encompassed both office management and dental assistant duties. In addition, Talley exercised significant discretion over financial matters and had ongoing access to the practice's bank accounts as well as Dr. Becker's Drug Enforcement Administration (DEA) registration number that authorized him to purchase controlled substances.

Dr. Becker did not recall ever administering hydrocodone to his patients, though he may have authorized the practice to purchase a small quantity of hydrocodone for

2

inventory.[1] Nonetheless, the practice regularly ordered hydrocodone from two suppliers: Henry Schein, Inc. ("Henry Schein") and Darby Dental Supply, LLC ("Darby"). From 2002 until mid-2011 the practice ordered approximately 26,700 pills of hydrocodone from Henry Schein. From 2006 to 2011, the practice ordered increasing dosages of hydrocodone from Darby, for a total of approximately 79,900 pills. Records from Henry Schein and Darby reflected that representatives spoke directly with Talley about these orders, either because she placed the initial order or because she verified an existing order when the supplier followed up with an inquiry. Similarly, records from the suppliers' delivery services showed that Talley was usually the individual who signed for receipt of the hydrocodone when it was delivered to the practice.

In 2011, both suppliers became suspicious of the high quantity of hydrocodone being ordered by the practice. Darby temporarily halted the practice's orders after they exceeded the threshold limits Darby set as the amounts a typical dentist would place during the same timeframes. When the practice did not respond to Darby's inquiries, Darby placed a permanent hold on its orders and reported Dr. Becker's DEA number to state and federal authorities. Around the same time as the Darby hold, the practice resumed placing large-quantity orders of hydrocodone from Henry Schein, ordering 3,500 pills during July and August 2011. Doing so led Henry Schein to place a temporary

---

[1] Dr. Becker's testimony at trial differed from his earlier statements that he had not ordered hydrocodone. Even so, at trial he testified to ordering hydrocodone for his practice "[n]ot frequently," estimating that he had perhaps authorized 100 pills to be ordered per year over the past ten years, quantities substantially lower than the amounts at issue. J.A. 532.

hold on the practice's account and to send a questionnaire to the practice asking for an explanation of its orders. Talley handwrote the responsive answers, and Dr. Becker signed the questionnaire, which explained that the practice used hydrocodone to "treat all emergencies and from surrounding military bases that are soon closing to get them treated." J.A. 248. When Henry Schein received the completed questionnaire, it resumed filling the practice's hydrocodone orders.

Meanwhile, in response to Darby's decision to report Dr. Becker's DEA registration number for excessive ordering, a Virginia investigator with the Department of Health Professions reviewed the practice's orders and detected one of the largest hydrocodone ordering histories she had ever seen. She coordinated an unannounced visit to the practice on August 18, 2011 in which she, her regional manager, and a police officer spoke to Dr. Becker and Talley about the practice's order history. At that time, Talley explained that she handled all of the practice's administrative duties, including ordering controlled substances. She admitted using Dr. Becker's registration number to order increasing amounts of hydrocodone for personal use and to give to family members, though she denied selling hydrocodone to anyone.

At some point during the interviews, Talley's husband arrived at the practice and consented to have the police officer search the Talley residence. As the officer and Mr. Talley approached the house, the officer observed Talley speed toward the house in her vehicle, jump out, and walk briskly into the house ahead of her husband and the officer. Talley's husband paused in the garage to retrieve a pill bottle containing hydrocodone,

4

which he gave to the officer.[2] As the men entered the house, the officer heard upstairs and downstairs toilets running as if they had just been flushed. He then observed Talley walk down the stairs. No one else was present in the residence.

In February 2016, Talley was indicted in the U.S. District Court for the Eastern District of Virginia on nine counts of obtaining hydrocodone through fraud, in violation of 21 U.S.C. § 842(a)(3); four counts of possession with intent to distribute hydrocodone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(E); and two counts of mail fraud, in violation of 18 U.S.C. § 1341. The indictment generally alleged that from 2002 to 2011, Dr. Becker's DEA registration number had been used to order about 100,000 hydrocodone pills from Darby and Henry Schein, but the specific charges against Talley were based solely on conduct occurring in 2011.

Talley pleaded not guilty and at her initial appearance *requested* a court-appointed lawyer claiming she could not afford to pay counsel. A magistrate judge tentatively appointed a federal public defender to represent her, but requested Talley's updated financial statements so as to determine whether she could afford to retain private counsel. Additional details surrounding proceedings related to counsel are discussed below, but for now it's sufficient to note that Talley's court-appointed counsel represented her during the jury trial.

---

[2] Subsequent analysis confirmed that the pill bottle contained hydrocodone and that the markings on the pills were consistent with hydrocodone Henry Schein delivered to the practice in August 2011.

The jury convicted Talley of all of the charges except for one count of obtaining hydrocodone by fraud. Thereafter, the district court sentenced Talley to 60 months' imprisonment. Talley noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291.

II.

Talley raises five issues on appeal. First, she contends the district court violated her Sixth Amendment right to counsel by denying her a continuance to obtain private counsel and by requiring her to make reimbursement payments of $3,000 per month for court-appointed counsel. Second, she asserts the district court abused its discretion by allowing the Government to introduce evidence of hydrocodone orders placed by the practice prior to 2011 and of bank records showing check-writing activity and unexplained sources of cash. Third, she claims the district court violated her Sixth Amendment Confrontation Clause rights by allowing the Government to introduce a summary of business records in the absence of the preparer. Fourth, she maintains the district court used an erroneous Rule 404(b) "bad acts" jury instruction. Lastly, she challenges the sufficiency of the evidence to support her fraud convictions.

A. Right to Counsel of Choice

Talley first alleges that the district court violated her Sixth Amendment right to counsel of her choice because the magistrate judge handling pre-trial matters suggested that she could not receive a continuance to obtain private counsel and also increased her payment for court-appointed counsel from $1,000 to $3,000 per month. Specifically,

6

Talley asserts that the magistrate judge's conduct "border[ed] on judicially imposed extortion" because he ignored Talley's repeatedly stated desire to obtain private counsel in light of her improved financial condition and instead "punish[ed]" Talley by requiring her to pay for court-appointed counsel. Opening Br. 23, 25. The record does not support the claims made by Talley, which are disingenuous at best.

The Sixth Amendment's right to counsel encompasses the right of non-indigent defendants to "choose who will represent" them. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). But the right to counsel of choice is qualified "in several important respects," *Wheat v. United States*, 486 U.S. 153, 159 (1988), including the court's "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar," *Gonzalez-Lopez*, 548 U.S. at 152 (internal citation omitted).

We do not need to explore the contours of the right to counsel of choice further, however, because Talley's entire argument is based on factual claims without foundation in the record. The proceedings before the magistrate judge centered on whether Talley was entitled to court-appointed counsel at all given her financial condition, not on whether she should be granted a continuance to retain private counsel or so that retained counsel could prepare for trial. The magistrate judge's repeated requests for financial updates arose because he was concerned about whether Talley was actually indigent and thus qualified for court-appointed counsel. And until the last hearing, Talley consistently contended that she could not retain private counsel, had been unsuccessful in her attempts to retain private counsel, and remained eligible for and should be allowed to proceed with

7

court-appointed counsel. This understanding of the respective concerns of the magistrate judge and Talley—especially that the magistrate judge was considering *requiring* Talley to retain private counsel—continued through the final hearing, which occurred after Talley was able to refinance her residence and thus had improved her financial position. Simply put, Talley's arguments on appeal fundamentally misrepresent the nature of the proceedings below and the context for the statements she points to on appeal.

Given the nature of Talley's arguments on this issue, some elaboration of the record is appropriate. After the Government issued Talley a target letter in December 2014, she requested that counsel be appointed for her. After a few months, Talley retained private counsel, though she represented to the magistrate judge that someone else had paid for that representation. In February 2016, the grand jury indicted Talley. In her initial appearance, she again requested court-appointed counsel, which the magistrate judge allowed, with the notation that he would assess whether Talley could reimburse the court for counsel's services after the probation officers had examined her financial status. Based on that "full[er] picture of Ms. Talley's financial condition," the magistrate judge issued a show cause order to determine why she "shouldn't be required to retain her own attorney or reimburse the government." J.A. 35–36. In particular, the court noted that it "appear[ed] [she] is more than capable of providing financial means to hire her own attorney, and it raised serious questions in the Court's mind as to whether taxpayers' dollars should be used to pay for an attorney in this case." J.A. 36. Based on the information in the financial report and relayed at the show-cause hearing, the magistrate judge decided to order Talley to retain private counsel. Specifically, he ordered that she

"contact at least ten attorneys in order to determine whether or not she can obtain representation, and . . . to share with those attorneys what [her] financial condition is." J.A. 42. The court also noted that she was expected to pursue a second mortgage or refinancing or a private loan, if necessary. In addition, Talley was required to report back to the magistrate judge after she had undertaken this effort. Further, the court determined that based on current information, Talley had sufficient resources to make reimbursement for court-appointed counsel at a rate of "at least $1,000.00 per month." J.A. 49. Talley made no objection.

In late April, the Government and Talley filed a joint motion to continue trial. The Government had a scheduling conflict with another trial and Talley noted that she had been having difficulty obtaining financing and locating private counsel. The district court granted the motion and rescheduled trial to begin on September 27, 2016.

During a status conference in June 2016, Talley informed the magistrate judge that she had still been unable to retain private counsel or financing to increase her ability to do so. The magistrate judge observed that "Ms. Talley is far from indigent. She has a home worth multiple hundreds of thousands of dollars. She has a job that pays her more than 95 percent of the defendants this Court sees. . . . I'm at the point where I think I should just cut her loose" as opposed to allowing her to keep court-appointed counsel until she could retain private counsel. J.A. 60. The court noted, however, that trial was set for more than 70 days out and that an alternative option would be to change the amount Talley paid as reimbursement for court-appointed counsel. After Talley was able to explain in greater detail her efforts at complying with the magistrate judge's order and the reasons for the

9

delays, the magistrate judge allowed her to continue to be represented by court-appointed counsel. It specifically reiterated that Talley's court-appointed counsel should continue preparing for the upcoming trial and proceed with counsel's duty "to represent and defend" Talley regardless of the ongoing concerns regarding her financial condition and ability to retain private counsel. J.A. 66. The court also noted that while it had the authority to change Talley's representation going forward, "what's more likely to happen" was to "address the terms under which Ms. Talley has been providing reimbursement." J.A. 66.

In August 2016, Talley indicated an intent to change her plea, but then changed her mind and elected to proceed to trial. As a result, the trial date was again rescheduled to begin on November 1, 2016.

In the interim, the magistrate judge ordered Talley to file another financial status report. By that time, she informed the court that she had obtained refinancing, but that those funds would not be available for the purpose of retaining private counsel or to make reimbursement for court-appointed counsel. The magistrate judge then issued another show cause order to determine why Talley's "monthly reimbursement payment should not be substantially increased" and she shouldn't be "held in contempt for failing to use the money obtained from her financing efforts" to retain private counsel and for "failing to timely notify the Court of these developments." Supp. J.A. 4.

At the ensuing hearing, Talley represented that although she had been able to obtain refinancing, her bank had approved and structured the loan so that the funds had to be used to pay off her substantial credit card debt. In other words, Talley had no

discretion to use the loaned funds for any other purpose, such as to retain private counsel. In any event, because paying off her credit card debt through those funds also freed up funds she'd been using to make minimum payments, Talley also "100 percent, agree[d] with the Court that she is now in a much better position to either pay the court back . . . more than a thousand dollars a month. There's no doubt about that . . . and she is more than happy [to] pay more than a thousand dollars a month." J.A. 88. Talley further explained that her failure to submit an updated financial report after obtaining refinancing was simply a misunderstanding of the magistrate judge's earlier order and that she had intended to provide an update whenever next ordered to do so.

At some point during the second show-cause hearing, Talley also indicated that now that she had more available funds and low credit card debt, what she "wishes to do, or hopes to do" was to locate private counsel willing to accept a retainer on her credit card, or to be approved for a private loan to do so. But Talley also reiterated that "if not, obviously she absolutely agrees she . . . would be able to pay more to [reimburse for court-appointed counsel] than a thousand dollars [per month]." J.A. 93–94.

At that point, the magistrate judge reiterated Talley's unusual financial condition compared to defendants who meet the requirements for court-appointed counsel. He also reiterated that Talley "well knew that her entitlement to court-appointed counsel . . . was dependent upon her pursuing the means by which she could afford to pay for counsel." J.A. 94. The court further noted that Talley now had even "more disposable income available to pay for counsel" and yet had not done so to date. J.A. 95. Further, the magistrate judge acknowledged that "[a] private attorney at this juncture, when a case . . .

11

has been continued twice and we are now 60 days or so from trial, doesn't appear to be that attractive of an option." J.A. 95. Based on these concerns, the magistrate judge initially indicated he was going to allow Talley to keep her existing court-appointed counsel, but raise her monthly reimbursement. But he then "paus[ed]" to reconsider whether "to *require* Ms. Talley to retain private counsel," J.A. 101 (emphasis added), announcing that he would "issue an order later today setting out what Mrs. Talley's financial responsibilities will be in this matter, and whether or not I will require her to seek her own private counsel." J.A. 103.

In the written order, the magistrate judge adhered to his initial assessment and "permitted [Talley] to retain her court-appointed counsel" because "*requiring* [her] to secure private counsel at this juncture would most likely require another continuance of the trial date." J.A. 109 (emphasis added). The order also increased her monthly reimbursement to $3,000 per month. Lastly, it indicated that in light of Talley's explanations, she would not be held in contempt. Talley made no objections.

As the full record context reveals, the statements by both Talley and the magistrate judge paint a much different picture than what Talley describes in her briefing to this Court. At no time either in argument before the magistrate judge or in filings in the district court did Talley move to substitute counsel or request a continuance to retain private counsel or to allow retained counsel more time to prepare. At no time did the magistrate judge say anything to suggest that Talley lacked the right to pursue or retain private counsel. And at no time did the district court deny a continuance in order for Talley to do so. Rather, the entire context of the proceedings was the magistrate judge's

12

early determination that Talley should *not* be allowed to continue with court-appointed counsel and that she was *required* to retain private counsel. The magistrate judge then followed up with multiple hearings to assess why Talley had not been able to do so and why she should be allowed to proceed with court-appointed counsel. To the extent the magistrate judge referred to the upcoming trial and another continuance, he did so as a basis for allowing Talley to proceed with her court-appointed counsel despite the fact that she could be ineligible for one. Given that Talley never pursued a continuance or sought to substitute private counsel, her claim on appeal that she was denied the right to counsel of choice is meritless and not based on the record.[3]

Talley also raises for the first time on appeal her challenge to the increase of her monthly payments to $3,000. Consequently, we review that decision for plain error, *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010), meaning that to show reversible error, Talley must prove that "there was an error, the error was plain, and the error affected [her] substantial rights." *United States v. Garcia-Lagunas*, 835 F.3d 479, 492 (4th Cir. 2016) (internal quotation marks omitted). Throughout the pre-trial stage, the magistrate judge conducted multiple hearings trying to assess Talley's true financial condition and required numerous financial submissions as part of that process. Talley agreed during the hearing prior to this increase that she could pay more than she had been to date ($1,000/month) because she had obtained refinancing on her house, which had opened up some funds. And after the increase to $3,000 per month, Talley did not dispute

---

[3] Counsel is admonished in future cases not to make claims without foundation in the record.

that amount or contend that she could only afford a more modest increase. On this record, we conclude no reversible error occurred in setting the amount Talley had to reimburse the court for her court-appointed counsel.

## B. Evidentiary Challenges

Talley next challenges the district court's admission of evidence of the practice's pre-2011 hydrocodone orders and of her bank records, which depicted that she wrote checks from Dr. Becker's accounts to herself and her husband and that she had unexplained sources of cash.

Federal Rule of Evidence 404(b) prohibits the use of uncharged crimes, wrongs, or other acts to prove character. The rule does allow the introduction of evidence of bad acts for other, noncharacter purposes, such as to prove "motive, opportunity, [or] intent." Fed. R. Evid. 404(b)(2). Rule 404(b) is a "rule of inclusion," and courts should allow the admission of evidence when it is "(1) relevant to an issue other than the general character of the defendant, (2) necessary . . . ., and (3) reliable." *United States v. Sterling*, 860 F.3d 233, 246 (4th Cir. 2017). In addition, Rule 404(b) is not implicated where the uncharged bad act "concerns acts intrinsic to the alleged crime." *United States v. Otuya*, 720 F.3d 183, 188 (4th Cir. 2013) (internal quotation marks omitted). Intrinsic evidence may involve "the same series of transactions as the charged offense, or if [it] is necessary to complete the story of the crime on trial," or to "provide context relevant to the criminal charges." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation marks omitted). Intrinsic evidence is still subject to Rule 403's balancing test for all

relevant evidence: whether its probative value is "substantially outweighed by" factors such as unfair prejudice. Fed. R. Evid. 403; *Basham*, 561 F.3d at 329.

We ordinarily review evidentiary errors for abuse of discretion, *Sterling*, 860 F.3d at 246, but when a defendant fails to preserve the issue for appeal, we review for plain error, *United States v. Moore*, 810 F.3d 932, 939 (4th Cir. 2016).

1.

At trial, the Government introduced supplier records demonstrating that Tally had used Dr. Becker's DEA registration number to order thousands of hydrocodone pills dating back years before the charged 2011 conduct.

Talley claims that this evidence concerning her pre-2011 hydrocodone ordering should have been inadmissible because it was not intrinsic evidence, it was too remote in time to the offense conduct to be relevant, and had minimal probative value compared to the unfair prejudice that arose from its admission. Because Talley did not object to the introduction of this evidence on Rule 404(b) grounds at trial, we review for plain error.

The district court did not plainly err in admitting the pre-2011 hydrocodone orders. Although the indictment only charged Talley with conduct that occurred in 2011, it referenced conduct dating back to 2002 as part of its general allegations. Further, trial evidence supported the conclusion that Talley ordered hydrocodone without Dr. Becker's authorization for years, depicting a consistent pattern of behavior that provided context for the charged offenses. In short, the charged conduct was an escalation of conduct that had been occurring for years using the same methods. The pre-2011 hydrocodone orders were thus intrinsic to the charged offenses—part of "the same series of transactions"—

15

and not subject to Rule 404(b) exclusion. *Basham*, 561 F.3d at 326.Nor did the district court plainly err in admitting this evidence under Rule 403's balancing test.

Moreover, any risk of unfair prejudice was mitigated by a limiting instruction to the jury. We have previously recognized that a limiting instruction concerning how the jury could consider such evidence eliminates the risk of unfair prejudice in all but the most extreme cases. *See United States v. Hall*, 858 F.3d 254, 279 (4th Cir. 2017). Here, the district court gave a limiting instruction that the pre-2011 hydrocodone orders were not evidence of the charged conduct, but were admitted solely to provide context for other evidence. Under these circumstances, admission of the practice's pre-2011 hydrocodone orders did not constitute plain error.

2.

Over Talley's objection, the district court allowed the Government to introduce into evidence bank account records showing both that Talley had written checks from Dr. Becker's practice accounts to herself and her husband and that she had unexplained sources of cash. The Government argued that this evidence was admissible for the following non-character reasons: (1) to negate Talley's alibi that she was not at work (and therefore could not perform practice business) on the days certain hydrocodone orders were placed; (2) to demonstrate Talley's control over the practice; and (3) to show Talley deposited proceeds of drug sales. Talley contends these putative reasons to admit the bank records lack merit and simply insinuate that she engaged in other bad conduct (such as embezzlement), which may have led the jury to conclude that she also engaged in the charged conduct. We disagree with Talley's arguments.

16

The district court did not abuse its discretion in admitting bank records reflecting checks written by Talley from the practice's accounts because this evidence was admissible both to negate Talley's alibi and to demonstrate her financial control within the practice. Specifically, Talley had alleged as an alibi that because she was not at work on some of the days hydrocodone orders were placed, she could not have placed those orders. But the bank records showed that she was able to write checks from the practice's account on some of those same days, thus indicating her ability to use practice accounts whether she was physically in the office or not. In addition, the number and nature of the checks were relevant to show the level of financial control she exercised within the practice. This evidence supported the Government's theory that Talley had the means and opportunity to engage in the charged conduct given her controlling position in the practice. In sum, the district court's admission of the evidence did not violate Rule 404(b) because the evidence was admissible for several proper purposes and was used for those purposes and not for a prohibited purpose.

The bank records were also admissible because they showed that Talley had unexplained sources of cash indicative of drug distribution and was directly probative of the four distribution charges. For instance, we have long recognized that "evidence of unexplained wealth is relevant in a narcotics prosecution as evidence of illegal dealings and ill-gotten gains." *United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir. 1986). The bank records were thus admissible as part of the Government's case against Talley, which required it to prove the intent to distribute component of the charged 21 U.S.C. § 841 offense. *See id.*; *see also United States v. Fisher*, 912 F.2d 728, 730 (4th Cir. 1990)

17

(observing that intent to distribute can also be inferred from quantities of drugs larger than needed for personal use). Contrary to Talley's argument, this evidence was not Rule 404(b) bad acts evidence at all.

Lastly, the district court did not abuse its discretion in concluding that the checks and bank records' probative value were not substantially outweighed by the risk of unfair prejudice. The district court specifically acknowledged Talley's concern that this evidence may be used improperly and said it would pay attention for such improper comments by the Government. At no time did Talley renew an objection based on the Government's arguments surrounding this evidence. For these reasons, the court did not abuse its discretion in allowing its admission.

### C. Confrontation Clause

Talley asserts the district court violated her Sixth Amendment right to confront her accusers by allowing the Government to introduce, in the absence of the preparer, a summary chart of 2011 hydrocodone orders placed by the practice to Henry Schein. The one-page cover page summarizes a multi-page exhibit that contained "invoices, tracking information and other information related to" the seven orders placed by the practice to Henry Schein in July and August 2011. J.A. 224. Henry Schein created and printed the summary, which "relate[d] to all of the documents" contained in the underlying business records. J.A. 230. Over Talley's objection, the district court allowed the summary to be

18

admitted under Rule 1006 (summary of voluminous documents) and the rest of the exhibit to be admitted under Rule 803(6) (business records).[4]

Notably, on appeal Talley challenges only the admission of the summary cover page. She does not challenge that the underlying contents of the exhibit were admissible as business records, nor does she argue that the contents of the summary differ from the underlying business records. The business records thus contain the same information contained in the summary, but in greater detail and on separate pages. We do not need to decide whether admission of the summary violated the Confrontation Clause, because even assuming that to be so, any error was harmless. *See United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (observing that the Court will not reverse when trial errors, even those implicating a defendant's constitutional rights, are harmless). "[A] violation may be found harmless on appeal if the beneficiary of the constitutional error can prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks omitted). In light of (1) the specific duplication of evidence in the summary cover page and underlying business records noted above and (2) the

---

[4] Federal Rule of Evidence 1006 allows parties to "use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006.

Rule 803(6) allows admission of "[a] record of an act, event, condition, opinion, or diagnosis if" (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business . . . ;" (3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony" of a qualified individual or certification; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

voluminous evidence showing that Talley placed the hydrocodone orders, we conclude that any error was harmless beyond a reasonable doubt.

## D. Jury Instruction

Talley argues the district court's Rule 404(b) instruction was highly prejudicial because it misstated the law and was misleading and confusing. Our review of the record shows that while Talley initially objected to this instruction in the district court, she later withdrew her objection. Although the Government does not rely on waiver in its response brief, our precedent is clear: "A party who identifies an issue, and then explicitly withdraws it, has waived the issue" and "it is not reviewable on appeal, even for plain error." *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) (internal quotation marks omitted). Because the record demonstrates waiver, we decline to address this issue further.

## E. Sufficiency of the Evidence

Lastly, Talley challenges the sufficiency of the trial evidence that supported the element of fraud in her separate convictions for obtaining hydrocodone through fraud and mail fraud. She contends that Dr. Becker gave her significant discretion and control over financial and administrative decisions in the practice such that she had implied authorization to use his DEA registration number to order hydrocodone. In addition, she points to Dr. Becker's signing the Henry Schein questionnaire as proof that he ratified her decisions after the fact even if he did not know about the orders in advance.

We review challenges to the sufficiency of the evidence de novo. *United States v. Ali*, 735 F.3d 176, 188 (4th Cir. 2013). But a defendant making such a challenges "bears

20

a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation marks omitted). The Court will "uphold a guilty verdict if . . . there is substantial evidence to support" it, *Elliott v. United States*, 332 F.3d 753, 760–61 (4th Cir. 2003), meaning "evidence that a reasonable finder of fact would accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 962. "[R]eversal for insufficiency must be confined to cases where the prosecution's failure is clear." *United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015) (internal quotation marks omitted).

As their titles reflect, the crimes of obtaining hydrocodone through fraud and mail fraud both have fraud as an element. To support a conviction for obtaining a controlled substance through fraud, the Government must prove that the defendant acquired a controlled substance by "misrepresentation, fraud, forgery, deception, or subterfuge." 21 U.S.C. § 843(a)(3). And to support a conviction for mail fraud, the Government must show that the defendant "devised or intended to devise a scheme to defraud," and used mail or wire communications to further that fraud. *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012).

Substantial evidence supports the jury's finding of fraud in this case. In particular, Talley confessed to the initial state investigator in August 2011 not only that she placed all of the practice's controlled substance orders, but also that she had placed the hydrocodone orders without Dr. Becker's knowledge. She also acted in a manner consistent with fraud when the police officer accompanied Talley's husband to search the Talley residence. In addition, the record contained Dr. Becker's contradictory statements

21

about his practice's order history for hydrocodone. Although some evidence indicated that the orders were authorized, the jury justifiably found that evidence to be outweighed by the voluminous evidence showing Talley acted without Dr. Becker's authorization. In particular, the jury was free to reject or give limited weight to Dr. Becker's last-minute changed testimony that he had authorized a small fraction of the hydrocodone orders placed by the practice. Similarly, the jury could reject or give limited weight to the significance of Dr. Becker's signature on the Henry Schein questionnaire given that the substantive responses were in Talley's handwriting and there was other evidence demonstrating her control over the practice and the trust that Dr. Becker had in her. *See, e.g.*, *United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004) ("The jury, not the reviewing court, assesses the credibility of the witnesses and resolves any conflicts in the evidence presented.").

At bottom, the record contains substantial evidence to support Talley's convictions, so she has not satisfied her "heavy burden" to challenge the jury's findings as to the element of fraud. *Beidler*, 110 F.3d at 1067.

III.

For the reasons provided above, the judgment of the district court is

*AFFIRMED*.

22