**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

TAVON MOUZONE, a/k/a Batman,
a/k/a Bloody Batman,

*Defendant - Appellant.*

No. 10-4781

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

ANTHONY FLEMING, a/k/a Mo Easy,

*Defendant - Appellant.*

No. 10-4814

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:08-cr-00086-WDQ-24; 1:08-cr-00086-WDQ-17)

Argued: May 18, 2012

Decided: July 26, 2012

Before KEENAN, WYNN, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Keenan and Judge Wynn joined.

## COUNSEL

**ARGUED:** Steven Kiersh, Washington, D.C.; Robert Henry Waldman, Annapolis, Maryland, for Appellants. Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Christopher Mason, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

## OPINION

FLOYD, Circuit Judge:

In April 2010, the government jointly tried Anthony Fleming and Tavon Mouzone, members of the gang Tree Top Piru (TTP), in an eight-day jury trial.

The grand jury charged both Fleming and Mouzone with conspiracy to participate in a racketeering enterprise (RICO conspiracy), in violation of 18 U.S.C. § 1962(d). It additionally charged Fleming with committing two drug offenses: (1) conspiracy to distribute and possession with the intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 853, and (2) distribution of and possession with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851.

The jury convicted both Fleming and Mouzone of the RICO conspiracy charge, finding that distribution of crack cocaine, distribution of cocaine, and robbery were conspiracy objectives. It declined to find that murder or conspiracy to commit murder was a conspiracy objective. The jury also convicted Fleming on both drug charges.

On July 9, 2010, the district court sentenced Mouzone to 240 months' imprisonment, running concurrent with a previous Maryland state court sentence, and it sentenced Fleming to three concurrent sentences—240 months' imprisonment on the RICO conspiracy charge and life imprisonment on each drug-related charge.

Mouzone and Fleming aver several district court errors. We find no reversible error and therefore affirm.

I.

TTP is a subset of the Bloods gang that developed in the Maryland prison system. According to evidence adduced at trial, members of the gang are expected to "put in work" to advance within the gang. "Putting in work" includes earning revenue for the gang and entails illegal activities such as robbery, distribution of drugs, and killing.

The government introduced evidence that Fleming and Mouzone were members of TTP and participated in gang activities in the Essex area of Baltimore County, Maryland. As part of their membership, they participated in the gang's drug-trafficking and other illicit activities.

Specifically, the government introduced evidence regarding their participation in two murders. Lamont Jackson was killed in his home on North Streeper Street in Baltimore on November 17, 2006. At trial, TTP members Terrence Brady and Troy Smith testified for the government as to statements by Fleming that he shot and killed Jackson in retaliation for Jackson's testimony against another TTP member, Antwoine Gross (aka Shooter). Another TTP member, Kowan Brice, provided testimony that he drove Fleming and Mouzone to an area near Streeper Street in a Dodge Durango. Brice claimed that he "split off" from Fleming and Mouzone and went to a convenience store. After hearing noises he thought to be gunshots

or fireworks, he returned to the Durango, where he met Fleming and Mouzone, and drove them back to Essex.

According to testimony presented at trial, Marquel Smith, a non-TTP member, began selling marijuana in Essex. When TTP decided to "make him pay" for selling drugs in their neighborhood, Mouzone indicated to TTP members that "it was time for them to put in some work." Shortly thereafter, in December 2006, Mouzone provided two 9mm firearms to two members, who accompanied him to Smith's house and killed Smith. Brady testified that one of the firearms Mouzone provided was the same firearm he had seen Fleming holding at TTP's headquarters in November. Baltimore police eventually recovered one of the firearms when the gang sold it, but it never recovered the other firearm.

Police arrested Fleming on April 24, 2007, after Baltimore Police Detective Zachary Wein observed a plastic baggie with a white rock substance protruding from a cell phone case on Fleming's hip. Seizure of the cell phone case revealed that it contained two plastic bags of crack cocaine.

## II.

The defendants put forth several challenges to the evidence introduced at trial. First, they assert that the government presented a drug analysis report and several 911 calls in contravention of the Confrontation Clause. Second, they urge that testimony provided by a firearm expert violated the district court's pretrial order on the permissible scope of that testimony and was unduly prejudicial.

Notably, both types of evidentiary rulings are subject to harmless error review. *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007) ("Evidentiary rulings are 'subject to harmless error review,' [and] a Confrontation Clause violation may be found harmless on appeal." (citation omitted)(quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997))).

Under this standard, "to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Brooks*, 111 F.3d at 371 (quoting *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995)) (internal quotation marks omitted).

### A.

We review alleged Confrontation Clause violations de novo. *United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010). The Confrontation Clause permits the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

### 1.

Fleming first challenges the district court's ruling permitting the government to present a drug analysis report regarding the bags of crack cocaine seized during his April 2007 arrest.

Forensic chemist Aisha Larkins performed an initial analysis of the type and weight of drugs seized. When the government learned that Larkins would be unable to testify at trial, however, it secured another chemist, Marta Iwashko, to perform a second analysis. Because Iwashko recorded the results of her analysis on the same ledger that Larkins used, the drug analysis report submitted into evidence at trial included both Iwashko's and Larkins's findings. Notably, however, Iwashko testified only as to her own findings and clarified that she (1) "conducted a totally separate and independent test from that which Ms. Larkins conducted" and (2) did not "use any notes or anything that Ms. Larkins had left."

Larkins reported that the first package of cocaine base weighed 55.45 grams and that the second package weighed 19.08 grams, but Iwashko reported that the first package weighed 46.26 grams and that the second package weighed 15.99 grams. When questioned at trial by the government about the discordant weight calculations, Iwashko explained that the cocaine base likely was "a clumpy substance [and] slightly wet" when initially submitted for analysis, but that "[t]wo and a half years later, when [she] analyzed it, . . . it was a lot [drier]," and thus, "the net weight [was] lighter."

Fleming contends that the district court violated the Confrontation Clause because the drug analysis report admitted into evidence included both Iwashko's and Larkins's findings. Moreover, he avers that Iwashko acted simply as a "surrogate witness" and that he was unable to "meaningfully cross-examine[ ]" her.

The Supreme Court has held that when "a forensic laboratory report containing a testimonial certification [is introduced] for the purpose of proving a particular fact," the Confrontation Clause requires that the accused "be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular [analyst]." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2710 (2011). Introducing an analyst "who did not sign the certification or perform or observe the test reported in the certification" to testify as a surrogate for the primary analyst is insufficient and cannot satisfy the Confrontation Clause. *Id.*

Here, we assume arguendo that admission of Larkins's findings via the drug analysis report violated the Confrontation Clause. Nevertheless, we are confident that such admission did not substantially sway the jury's final judgment regarding Fleming's drug charges. Iwashko conducted an independent analysis of the seized drugs, and her weight determinations, albeit less than Larkins's, were well above the

fifty gram threshold of which Fleming was convicted. Furthermore, because she conducted an analysis free from reliance on Larkins's research, she adequately answered the government's questions regarding her research and any evident discrepancies.

We find no merit to Fleming's contention that he was unable to cross-examine Iwashko in a meaningful manner. The record reveals that defense counsel focused its cross-examination on distinguishing Larkins's findings from Iwashko's and on clarifying that the report contained data for which Iwashko was not responsible. Iwashko answered all of these questions ably, and she made clear the independence of her findings and made no attempt to vouch for those of Larkins.

Accordingly, we conclude that the drug type and quantity analysis presented by the government at trial was well-supported by a witness who competently testified as to the report's results, and we reject Fleming's contention that admission of portions of the report, if erroneous, had the effect of altering the jury's verdict.

2.

The government sought to introduce four 911 calls made in relation to the Lamont Jackson shooting. The district court admitted three of the calls. Fleming alleges that the admitted calls were testimonial and that their admission violated the Confrontation Clause.

The first caller made two calls. In his initial call, he described the shooting and then explained to the operator that "the shooter must have 'meant to kill' the victim because he 'ran inside the house and shot [the victim] . . . like 15 [times].'" He also provided information about the location of the shooting, reported that the shooter was wearing a green jacket and was accompanied by a darker, younger man, and told the operator that the shooter and the accomplice fled the

scene in a "Durango truck." The district court declined to admit this call. In his second call, made shortly after the first, the caller reported that the Durango had returned to Streeper Street, but he provided only the location of the truck before hanging up.

The second and third callers arrived at the scene after the shooting—one reported the victim's condition, and the other requested an ambulance. Neither provided information about the shooting or the assailants.

We recognize at the outset that although a 911 call may qualify as a police interrogation, *see Davis v. Washington*, 547 U.S. 813, 823 n.2 (2006), such calls are not inherently testimonial. *Id.* at 826-29. They "are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. And they become testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

Here, in the three calls that the district court admitted, each caller simply reported his observation of events as they unfolded. The call transcripts do not reveal questioning by the 911 operator that indicates an attempt "to establish or prove past events." Rather, the transcripts simply reflect an effort to meet the needs of the "ongoing emergency." Thus, we conclude that the calls were nontestimonial, and we affirm the district court's decision to admit them.

B.

The government also presented Baltimore County Police Sergeant Mark Ensor, a firearm and toolmark examiner, who testified regarding shell casings recovered from the two mur-

der scenes. Via Ensor's testimony, the government sought to prove that the firearm used to kill Jackson was also one of the firearms used to kill Marquel Smith.

In pretrial motions, the government and the defense debated the manner in which the district court should permit Ensor to testify. Citing recent cases regarding the lack of scientific rigor underpinning ballistics identification testimony, defense counsel urged the court to "prohibit the introduction of any testimony that a 'match' between cartridge casings discovered in the course of [the] case be concluded within a reasonable degree of scientific certainty." Accordingly, following a hearing on the admissibility of Ensor's testimony, Magistrate Judge Grimm issued a report and recommendation ordering (1) that Ensor be prohibited from opining that it was a "practical impossibility" for different firearms to have fired the casings, and (2) that he "state his opinions and conclusions without any characterization as to the degree of certainty with which he holds them." The district court adopted Judge Grimm's recommendations in full.

At trial, prior to Ensor's testimony, the prosecutor, Mr. Hanlon, and the court engaged in the following colloquy:

> [AUSA]: On Friday, we had some discussion about the specific words and terminology that Sergeant Ensor would be using when he stated the most critical of his opinions in this case.

> The Court: Yes.

> [AUSA]: We talked, and the Court, I'm sure, recollects the discussion about the word "match" —

> The Court: Yes.

> [AUSA]: — and I indicated I'd like to use the word "match," but, frankly, I wasn't necessarily sure what word Sergeant Ensor would use.

The Court: Yes.

[AUSA]: What he tells me – and I basically just asked him over the weekend, "What would you say," and he tells me this: His opinion would be that there were sufficient similarities and characteristics on the cartridges from our two critical scenes for him to be willing to opine that the same firearm fired the cartridges.

That would be the content of his opinion, and I would ask him the basis for it. I've advised him not to talk about exclusions and possible impracticalities or possibilities, and we're not going to be going to a reasonable degree of anything or anything like that, but that would be the specific way he would articulate his statement.

The Court: Okay.

Defense counsel objected to the government's proposed wording, but the district court overruled the objection.

When Ensor testified, he stated repeatedly that the casings were "fired from the same firearm." At one point he said, "If I go around this breech face and see that all these markings are matching up and phase with each other, the chances of that happening in a random fashion on two different surfaces, there comes a point where it's a practical impossibility. . . . That's when I'm convinced that these two [cartridge cases] were marked by the same surface." Defense counsel entered multiple objections during Ensor's testimony, but the district court overruled all of them.

Appellants contend that the district court erred in "permitting the government to elicit and emphasize the certainty of their firearms examinations." Specifically, they allege that Ensor's testimony violated the district court's order and was

"unfairly prejudicial" because it "portrayed the defendants as killers and created a real danger that the jury would conclude that the defendants were gang members because they were killers."

Although we generally review evidentiary rulings for abuse of discretion, *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009), here, "[w]e need not decide whether the district court erred . . . because we hold that any error would be harmless," *Banks*, 482 F.3d at 741.

Ensor's testimony was incapable of effectuating the prejudice that Appellants allege. To the contrary, it supported only the notion that the same weapon fired the casings recovered at each murder scene. In other words, it potentially connected the firearm to both murders, thereby linking the murders to each other, but it did not prove that Mouzone or Fleming was responsible for the casings at either murder. Thus, to the extent that the jury concluded that Appellants were killers and allowed that conclusion to influence their final verdict, Ensor's testimony was not the cause. Moreover, the jury did not find murder to be a conspiracy objective, supporting the conclusion that it was not substantially swayed by the evidence to find that the defendants committed any murder, much less that because they committed one murder, they also committed another.

Accordingly, we decline to reverse based on the district court's admission of the testimony.

### III.

Mouzone and Fleming next allege that the district court erred in charging the jury on the elements of their 18 U.S.C. § 1962(d) offense.

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of [18 U.S.C. § 1962(c)]." Section 1962(c), in turn, makes it

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

At trial, Mouzone and Fleming requested the following jury instruction regarding their § 1962(d) RICO conspiracy charge: "In order to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs. Some part in directing the enterprise's affairs is required." Mouzone and Fleming appeal the district court's denial of their request. Although we review a district court's refusal to give a jury instruction for abuse of discretion, *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010), we conduct a de novo review of any claim that jury instructions incorrectly stated the law. *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003).

Mouzone and Fleming base their contention on *Reves v. Ernst & Young*, 507 U.S. 170 (1993), where the Supreme Court held that liability under § 1962(c) requires an individual to have participated in the operation or management of an enterprise. *Id.* at 185. Thus, § 1962(c) "applies not to 'any person,' but to any person associated with an enterprise who participates in the operation or management of the enterprise." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000). Appellants claim that this standard similarly applies to § 1962(d) liability and that to conspire to violate § 1962(c), one must have a managerial role in the enterprise's affairs. We disagree.

The elements of a substantive RICO offense under § 1962(c) are "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). A "'pattern of racketeering activity' requires at least two acts of racketeering activity," 18 U.S.C.

§ 1961(5), commonly known as "predicate acts," *see Salinas*, 522 U.S. at 62, and a "racketeering activity" includes "any act or threat involving murder, . . . robbery, . . . or dealing in a controlled substance . . . , which is chargeable under State law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A).

Notably, however, a defendant can conspire to violate RICO and violate § 1962(d) without "himself commit[ing] or agree[ing] to commit the two or more" acts of racketeering activity. *Salinas*, 522 U.S. at 65. Rather, simply agreeing to advance a RICO undertaking is sufficient. That is,

> [a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.

*Id.* Of course, such an approach finds ample support in foundational conspiracy principles—namely, (1) that conspiracies exist even though each conspirator may not "agree to commit or facilitate each and every part of the substantive offense," and (2) that an individual may be "liable for conspiracy even though he was incapable of committing the substantive offense." *Id.* at 63-64.

Reasoning from these principles, we today join all of our sister circuits that have considered this issue and hold that § 1962(d) liability does not require that a defendant have a role in directing an enterprise. *See United States v. Wilson*, 605 F.3d 985, 1019 (D.C. Cir. 2010); *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Smith v. Berg*, 247 F.3d 532, 537–38 (3d Cir. 2001); *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000); *Brouwer*, 199 F.3d at 967; *United States v. Posada-Rios*, 158 F.3d 832, 857-58 (5th Cir.

1998). Just as a conspirator need not himself commit or agree to commit the predicate acts required under § 1962(c), he also is not required to play the managerial role required for § 1962(c) liability.

We caution that the RICO conspiracy statute does not "criminalize mere association with an enterprise." *Brouwer*, 199 F.3d at 965. Rather, as with traditional conspiracy, criminal liability will attach only to the knowing "agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). Thus, to satisfy § 1962(d), the government must prove that an enterprise affecting interstate commerce existed; "that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *Wilson*, 605 F.3d at 1018–19; *see also Posada-Rios*, 158 F.3d at 857 ("To prove a RICO conspiracy[,] the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense."). Consequently, because we hold that a defendant need not have a managerial role in an enterprise to be convicted of violating § 1962(d), we conclude that the district court did not err in declining the defendants' requested jury instruction.

IV.

Fleming also avers that the district court erred in denying his pretrial motion to sever, alleging (1) that the government improperly joined under Federal Rule of Criminal Procedure 8(a) his charge for cocaine distribution and possession with intent to distribute with his RICO charge, and (2) that even if the government properly joined these counts, the district court

should have severed them under Federal Rule of Criminal Procedure 14.

"Whether offenses in an indictment are improperly joined under Rule 8(a) is a question of law reviewed de novo." *United States v. Cardwell*, 433 F.3d 378, 384–85 (4th Cir. 2005). Moreover, "[w]e will not reverse a district court's denial of a motion to sever unless there is a showing of 'clear prejudice.'" *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012) (quoting *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008)).

## A.

Federal Rule of Criminal Procedure 8 permits the government for the sake of efficiency to "charge a defendant in separate counts with [two] or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Previously, "[w]e have interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a 'logical relationship' to one another." *Cardwell*, 433 F.3d at 385 (quoting *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992)). Nevertheless, we also have recognized that "Rule 8(a) is 'not infinitely elastic,' . . . because unrelated charges create the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense." *Id.* (quoting *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003)).

Here, Fleming contends that his cocaine distribution and possession charge "clearly bore no relationship to the RICO count" and that "by all accounts, [on April 24, 2007, he] was acting on his own, was not the subject of a federal investigation, was not wearing anything remotely resembling gang clothing, was not armed[,] and was not working with any other person." The government contends, however, that it

properly joined all three of Fleming's counts because the RICO conspiracy count "charged that the purposes of the TTP enterprise included preserving the power of the enterprise through narcotics trafficking, and alleged that it was part of the TTP enterprise that members of the gang engaged in drug-trafficking." Moreover, "Count One explicitly alleged that the April 24, 2007[,] narcotics possession was an overt act by Fleming in furtherance of the racketeering conspiracy." We agree with the government.

The indictment alleges a sufficient relationship between the RICO conspiracy count and the drug distribution count, and at trial, the government presented ample evidence showing that selling drugs was an activity in which TTP members engaged to support the gang and rise in its ranks. Furthermore, the government's assertion that distribution of cocaine was a predicate offense of the RICO conspiracy made its joinder to the RICO count appropriate. *See United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006); *United States v. Irizarry*, 341 F.3d 273, 289–90 (3d Cir. 2003).

B.

Having determined that the government properly joined Fleming's charges, we address whether Fleming has shown "clear prejudice" by such joinder.

Simply put, nothing about the joinder of Fleming's counts bespeaks "clear prejudice." The government presented ample evidence to support each count, and the district court instructed the jury to weigh the evidence as to each count individually. Moreover, Fleming's brief to this court complains of prejudice, but fails to cite any specific indicia of prejudicial effect. Accordingly, we affirm the district court's denial of Fleming's motion to sever.

V.

Fleming asserts the following three errors with respect to his sentence: (1) the district court erred in determining that the

Lamont Jackson murder constituted relevant conduct for the purpose of calculating his combined base offense level under the Sentencing Guidelines; (2) the district court improperly found that he was subject to an enhanced mandatory minimum for a prior "felony drug offense"; and (3) the Fair Sentencing Act should have been applied retroactively to his sentence. We reject each contention.

A.

At sentencing, the district court increased Fleming's offense level from 19 to 43 because it determined that "more likely than not[,] . . . Mr. Fleming killed [Lamont] Jackson and that [the] murder [was] relevant and related conduct in setting the guidelines range." Fleming avers that the district court lacked sufficient evidence to conclude that he killed Jackson and that it erred in determining that the Jackson murder constituted relevant conduct for the purpose of calculating his combined offense level.

We review district court sentences only for reasonableness. *United States v. Llamas*, 599 F.3d 381, 387 (4th Cir. 2010). We examine whether "the district court committed [any] significant procedural error, such as . . . improperly calculating . . . the Guidelines range . . . [or] selecting a sentence based on clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). "In this regard, we review the court's factual findings for clear error . . . [and] its legal conclusions de novo." *United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012). Moreover, "[u]nder the clear error standard of review, we 'will only reverse if left with the definite and firm conviction that a mistake has been committed.'" *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012) (quoting *United States v. Slade*, 631 F.3d 185, 188 (4th Cir. 2011)).

The base offense level for a defendant convicted of racketeering conspiracy is the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G.

§ 2E1.1. In evaluating the offense level applicable to the underlying activities pursuant to § 3D1.2(d), the district court may group "[a]ll counts involving substantially the same harm," including counts where "the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *Id.* § 3D1.2(d). Thus, as an initial matter, we note that the district court properly grouped Fleming's charges for sentencing purposes.

When offenses are grouped under § 3D1.2(d), the district court considers as relevant conduct "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2).

Of course, Fleming contends that the district court lacked sufficient evidence to find that he murdered Jackson. But at trial, the government presented ample testimony, via Brady, Smith, and Brice, that Fleming committed the crime. And while we recognize that the jury declined to find that Fleming murdered Jackson, we also affirm the district court's entitlement to make its own findings, supported by a preponderance of the evidence, regarding Fleming's offenses for sentencing purposes. *See United States v. Montgomery*, 262 F.3d 233, 249 (4th Cir. 2001). Here, given that the government presented evidence that Fleming murdered Jackson to avenge another TTP member, the district court properly considered the murder relevant (i.e., part of the same course of conduct or common scheme or plan).

Thus, we conclude that the district court did not clearly err in determining that Fleming's combined offense level was 43, the level corresponding to murder.

## B.

When the district court sentenced Fleming, 21 U.S.C. § 841(b)(1)(A) provided that the penalty for distribution of or

conspiracy to distribute fifty grams or more of cocaine was imprisonment for a minimum of ten years and a maximum of life. The statute also provided, however, for a sentence enhancement increasing the mandatory minimum to twenty years if the defendant had a "prior conviction for a felony drug offense."

A "felony drug offense" is "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). Here, Fleming's presentencing report indicates that he was sentenced to two years' imprisonment with eighteen months' probation for a Maryland drug violation. Accordingly, the district court enhanced Fleming's sentence range to a minimum of twenty years' imprisonment and a maximum of life.

Citing our recent decision in *United States v. Alston*, 611 F.3d 219 (4th Cir. 2010), Fleming contends that the district court erred in applying the enhancement because the Maryland conviction on which it relied derived from an *Alford* plea. *North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (permitting a defendant to enter a plea of guilty without acknowledging culpability for the charged conduct). We review this pure question of law de novo. *United States v. Burgess*, 478 F.3d 658, 661 (4th Cir. 2007), and find that *Alston* fails to apply here.

In *Alston*, we considered whether a prosecutor's proffer of facts from the transcript of an *Alford* plea proceeding could serve as sufficient proof that the assault to which the defendant pled guilty was an assault that qualified as a violent felony under the Armed Career Criminal Act. *Alston*, 611 F.3d at 220-21. Ultimately, we held that the prosecutor's proffer of facts was insufficient to qualify the offense because (1) the defendant did not admit to the facts, and (2) the proffered facts were not "inherent in a Maryland conviction for second-

degree assault." *Id.* at 221. Notably, however, *Alston* does not categorically prohibit the use of a conviction obtained from an *Alford* plea as a predicate offense for a statutory enhancement. *See United States v. King*, 673 F.3d 274, 281-82 (4th Cir. 2012). Rather, it bars a "prosecutor's proffer of the factual basis for an *Alford* plea [from being] later . . . used . . . to identify the resulting conviction as an ACCA predicate." *Id.* at 227.

Here, the district court relied simply on the fact of conviction, not on the prosecutor's version of facts from the plea colloquy, to determine that Fleming's Maryland conviction qualified as a predicate offense. And because Fleming's plea involved a drug offense that was punishable by imprisonment for more than one year, it qualified as a predicate under 21 U.S.C. § 841(b)(1)(A). The conviction itself satisfied the requirement for a predicate offense, so there was no need to consider the underlying facts. For this reason, *Alston* has no bearing on this case. Thus, we find no error in the district court's enhancement.

## C.

Finally, Fleming contends that the Fair Sentencing Act of 2010 should be applied retroactively to his sentence. We disagree. The Act took effect on August 3, 2010, and although in some instances it applies retroactively, *see Dorsey v. United States*, No. 11-5683, slip op. at 19 (U.S. June 21, 2012), the timing of Fleming's crimes and sentencing fail to meet the criteria for such application. Fleming was sentenced on July 9, 2010, and the Act applies retroactively only to "offenders whose crimes preceded August 3, 2010, but who are sentenced after that date." *Id.* at 11; *see also United States v. Bullard*, 645 F.3d 237, 248–49 (4th Cir. 2011). Thus, we affirm Fleming's sentence as determined by the district court.

## VI.

For the foregoing reasons, we affirm.

*AFFIRMED*