**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-4063**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

ELMER DE JESUS ALAS CANDRAY, a/k/a German Alexander Ramirez Lopez, a/k/a Buky, a/k/a Desquiciado,

        Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Michael Stefan Nachmanoff, District Judge. (1:22-cr-00178-MSN-1)

---

Submitted: April 3, 2026                        Decided:  June 2, 2026

---

Before DIAZ, Chief Judge, and AGEE and QUATTLEBAUM, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Agee wrote the opinion in which Chief Judge Diaz and Judge Quattlebaum joined.

---

**ON BRIEF:** Andrew M. Stewart, SLOANE STEWART, PLLC, Fairfax, Virginia, for Appellant. Todd Blanche, Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lindsey Halligan, United States Attorney and Special Attorney, Megan C. Braun, Assistant United States Attorney, Natasha Smalky, Assistant United States Attorney, Alexandria, Virginia, Daniel J. Honold, Assistant United States Attorney, Robert K. McBride, First Assistant United States Attorney, John C. Blanchard,

Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

This case stems from murders and an attempted murder committed by the Mara Salvatrucha ("MS-13") gang's Uniones Locos Salvatrucha ("ULS") clique. The Government indicted 8 defendants for their roles in these crimes. Through plea agreements, however, it whittled down the defendants standing trial to one: Elmer de Jesus Alas Candray, the appellant at bar. At the close of his two-week trial, the jury convicted him on all fourteen counts.

This appeal concerns only Alas Candray, who challenges (1) the sufficiency of the evidence supporting his convictions, and (2) the constitutionality of the mandatory life sentences imposed by the district court.

For the reasons set forth below, we affirm the district court's judgment in its entirety.

I.

A.

From September 2020 through his arrest in August 2022, Alas Candray served as ULS's second-in-command.[1] The Government adduced extensive evidence of Alas Candray's involvement in seven murders or attempted murders. For the sake of brevity, we recite only the most salient facts below.

*August 2018 Murder*. Three cooperating witnesses—Jose Lozano Duran ("Lozano"), Jose Garcia Sanchez ("Garcia"), and Jose Sanchez Guevara ("Sanchez")—

---

[1] Because Candray was convicted of all charges, this Court views the facts in the light most favorable to the Government. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

3

testified about the murder of Kevin Abarco Choto ("Choto"). They testified that Choto owed a debt to another MS-13 clique, which led the gang's leadership to approve Choto's murder. ULS's First Word, i.e., its first-in-command, directed Alas Candray to stay with Choto leading up to the murder and specified which ULS members should commit the murder. Consistent with that plan, Alas Candray and Choto went to get dinner for the group and, after the meal, Alas Candray and others went into the backyard while ULS members killed Choto. Afterward, Alas Candray helped dismember and dispose of Choto's body.

*June 2019 Murder*. Lozano, Garcia, and Sanchez also testified about the murder of Jose Guillen Mejia ("Mejia"). They travelled with Alas Candray and other ULS members to Reston, Virginia, to kill men who had attempted to leave ULS. When the group could not locate their initial targets, they decided to target members of a rival gang instead. ULS's leader assigned roles for the murder: some ULS members were to wait in vehicles, while Alas Candray, Lozano, and others were to search a wooded area where rival gang members were known to hang out. The group eventually found Mejia, and Alas Candray and Lozano shot him. Alas Candray told ULS's leader that he and Lozano shot Mejia, after which the other ULS members attacked Mejia with machetes.

*September 2020 Murder*. Lozano, Ever Melendez Garcia ("Melendez"), and Jose Vasquez Moz ("Vasquez") testified about the murder of Iris Janet Ponce Garcia ("Ponce "). They explained that Henry Barrera Ayala ("Barrera") found Ponce online based on her association with a rival gang. Candray, Lozano, Barrera, and Adonis Martinez Ayala ("Martinez") met in a park to plan Ponce's murder. Pursuant to their plan, Barrera and Lozano invited Ponce to smoke marijuana and brought her to the park, where Alas Candray

4

and Martinez were waiting. All four men shot Ponce. Vasquez and Melendez later learned the details of the murder from Alas Candray and Barrera.

*November 2020 Murder Conspiracy*. Lozano and Melendez testified that after Douglas Arriola Acosta, who was known to them as Flaco, pulled a machete on ULS members, Alas Candray sent a message to MS-13 leadership requesting permission to murder him. Once his request was approved, various ULS members attempted to murder Flaco. Lozano and Barrera messaged each other in code, planning Flaco's murder. Separately, Alas Candray told Melendez to kill Flaco on two occasions—once with a knife when Flaco was seen in public and once with a gun when the pair saw Flaco outside his apartment. But ULS did not follow through with its plans.

*March 2021 Murder*. Vasquez, Melendez, and Lozano testified about the murder of Santos Trejo Lemos ("Lemos"), an enemy of ULS. Lemos was seen in Reston, Virginia, so Vasquez, Melendez, Alas Candray, and another ULS member gathered there. The group found Lemos and Alas Candray directed Melendez to follow him on foot while Alas Candray, armed with a gun, waited near Lemos's apartment. Melendez lost track of Lemos, but both he and Vasquez heard gunshots near his apartment. As they drove away, Alas Candray showed Vasquez his gun, said that he had fired all of his rounds, and explained the murder in detail. Alas Candray later informed Lozano that he killed Lemos with the same gun used in the Ponce murder.

*May 2022 Murder*. Vasquez, Melendez, and Lozano further testified about the murder of Rene Alberto Pineda Sanchez ("Pineda"). The day of the murder, Alas Candray, Lozano, Martinez, and another ULS member saw Pineda, whose murder had already been

5

approved by ULS. Once Pineda was alone, the four ULS members attacked him and, to ensure he was dead, Alas Candray and another member dropped a large stone on Pineda's head. Soon thereafter, Vasquez picked up the group in his car, and they described the murder to him. Melendez separately learned of the murder during a meeting with other ULS members.

*June 2022 Murder*. Vasquez, Lozano, and Melendez also testified about the murder of Francisco Raul Avelar Rivera ("Avelar"). Avelar broke ULS's rules, so Alas Candray, Lozano, and other ULS members voted to kill him. Alas Candray and Vasquez chose to do so at a particular location in a local park. The day of the murder, Alas Candray and another member took Avelar to the park under false pretenses, pretending that other ULS members were being disciplined. Upon their arrival, Alas Candray, and other members began to beat Avelar with a bat. Once Avelar passed out, Alas Candray stabbed him in the neck. Alas Candray also called Vasquez, directed him to come to the park, and told him to stab Avelar.

B.

After multiple iterations of an increasingly complex indictment, a grand jury returned the operative third superseding indictment in June 2024. Alas was indicted for the following crimes:

Count 1: Conspiracy to Participate in a Racketeering Enterprise (and including as overt acts in furtherance of the enterprise all of the murders addressed in the indictment);
Counts 2, 3, and 4: Conspiracy to Commit Murder in Aid of Racketeering, Murder in Aid of Racketeering, and Use of a Firearm during a Crime of Violence Causing Death in connection with the Mejia murder;
Counts 5, 6, and 7: Conspiracy to Commit Murder in Aid of Racketeering, Murder in Aid of Racketeering, and Use of a Firearm during a Crime of Violence Causing Death in connection with the Ponce murder;

6

Count 8: Conspiracy to Commit Murder in Aid of Racketeering in connection with the Flaco murder conspiracy;
Counts 9, 10, and 11: Conspiracy to Commit Murder in Aid of Racketeering, Murder in Aid of Racketeering, and Use of a Firearm during a Crime of Violence Causing Death in connection with the Lemos murder;
Count 12: Murder in Aid of Racketeering in connection with the Pineda murder; and
Counts 13 and 14: Conspiracy to Commit Murder in Aid of Racketeering and Murder in Aid of Racketeering in connection with the Avelar murder.

J.A. 32–72. Eight defendants were indicted, five of whom—Lozano, Garcia, Sanchez, Melendez, and Vasquez—pleaded guilty pursuant to plea agreements and testified at trial. Two others—Martinez and Barrera—pleaded guilty pursuant to plea agreements with sentences agreed upon by the parties. Alas Candray was therefore the sole defendant to stand trial.

The Government called 35 witnesses, including the five cooperating ULS members. Alas Candray did not present a defense. The same day the case was submitted, the jury found him guilty on all counts and made special sentencing findings of guilt for all six murders.

At the sentencing hearing, the district court granted the Government's motion to dismiss Alas Candray's three convictions for using and carrying a firearm during a crime of violence. As to the remaining charges, the district court sentenced Alas Candray to six concurrent life sentences—one for the racketeering conspiracy conviction and one for each of the five murder in aid of racketeering convictions. The court also sentenced Alas Candray to 120 months' imprisonment on each of the five conspiracies to commit murder in aid of racketeering, to be served concurrently.

7

Alas Candray timely appealed, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

II.

Alas Candray first argues that the Government failed to adduce sufficient evidence to support each of his convictions. We disagree.

We review de novo a challenge to the sufficiency of the evidence supporting a jury verdict. *United States v. Hager*, 721 F.3d 167, 179 (4th Cir. 2013). "In resolving a sufficiency challenge, we view the evidence in the light 'most favorable to the prosecution' and assume the jury resolved all credibility disputes or judgment calls in the government's favor." *United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). Given this deferential lens, "[w]e must uphold the jury's verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020)). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)).

Before turning to Alas Candray's arguments, we begin with a brief organizational note. With respect to Choto's murder, the Government did not charge Alas Candray with conspiracy to commit murder or murder in aid of racketeering activity under Violent Crimes in Aid of Racketeering ("VICAR"), 18 U.S.C. § 1959. Instead, it alleged only that Choto's murder was an overt act of and a special sentencing factor for the Racketeer

8

Influenced and Corrupt Organizations ("RICO") Act conspiracy. The remaining murders (and attempted murder), however, were charged as both overt acts of the RICO conspiracy *and* violations of VICAR. Accordingly, we address Choto's murder only in the RICO conspiracy section, but we address Alas Candray's arguments related to the remaining convictions in the VICAR section because Alas Candray urges that all of them—VICAR and RICO alike—be reversed for the same reason: the Government failed to prove his involvement.

## A.

Alas Candray argues that the Government failed to prove racketeering activities for which the maximum penalty is life imprisonment.[2]

To prove a RICO conspiracy, the Government must establish three elements: "(1) [the existence of] an enterprise affecting interstate commerce . . . ; (2) [that] each defendant knowingly and intentionally agreed with another person to conduct or participate in [its] affairs; and (3) [that] each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts in furtherance of the conspiracy." *Huskey*, 90 F.4th at 662 (cleaned up). "[R]acketeering activity" includes murder offenses that violate state law. 18 U.S.C. § 1961(1).

In general, a defendant who is convicted for his involvement in a RICO conspiracy "may receive a sentence of up to twenty years' imprisonment." *United States v. Simmons*,

---

[2] Even though the Government charged Candray with various overt acts that do *not* expose him to life imprisonment, he fails to challenge any of them. Instead, his arguments are laser-focused on the overt acts related to the murders.

9

11 F.4th 239, 255 (4th Cir. 2021); *see* 18 U.S.C. § 1963(a). But when the conviction is "based on a racketeering activity for which the maximum penalty includes life imprisonment," the maximum penalty increases to life imprisonment. 18 U.S.C. § 1963(a).

With these principles in mind, the problem for Alas Candray comes into focus: there is extensive evidence connecting him to Choto's murder. Before ULS approved Choto's murder, ULS members drove to Massachusetts to prepare for the killing. Although the group did not carry out the murder during that trip, they later returned and killed Choto. Lozano, who was involved in the initial trip to Massachusetts, testified that ULS's leader was "directing the entire operation" and assigned Alas Candray the role of keeping an eye on Choto. J.A. 591; *see* J.A. 591–92.[3]

Garcia and Guevara, who were both involved in the murder, testified that Alas Candray was tasked with staying with Choto. In that role, Alas Candray went to dinner with Choto and the pair brought food back to the previously-chosen murder location: a ULS member's house. Garcia testified that, although he and Alas Candray went outside during the murder, when they re-entered the house, they took turns touching the belt that was used to strangle Choto. He also testified that Alas Candray helped dismember Choto, and Guevara testified that Alas Candray helped bury him.

Considering this evidence, a reasonable factfinder could conclude that Alas Candray participated in Choto's murder and, in so doing, "agreed to advance the enterprise." *United*

---

[3] Throughout the trial transcript, Lozano, Sanchez, and Vasquez refer to Candray by his nicknames: "Buky" and "Desquiciado." *See* J.A. 42, 570, 747, 943–44.

*States v. Cornell*, 780 F.3d 616, 631 (4th Cir. 2015). That is enough to affirm the jury's conclusion over Alas Candray's sufficiency challenge. *Id.*

Although Alas Candray concedes he was "instructed to assist with the dismemberment of [Choto]," he insists that the Government's reliance on his involvement in the murder cannot stand because he was "outside during the murder." Opening Br. 59. He misunderstands conspiracy law. "[A] defendant can conspire to violate RICO and violate § 1962(d) without 'himself commit[ting] or agree[ing] to commit the two or more' acts of racketeering activity." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)) (alterations in original). So, it's not dispositive that Alas Candray *himself* didn't murder Choto.

Consequently, we conclude that the jury was entitled to rely on Choto's murder as an overt act in furtherance of the RICO conspiracy.[4]

## B.

The jury convicted Alas Candray of ten counts under VICAR—five counts for murder in aid of racketeering activity and five counts for conspiracy to commit murder in aid of racketeering activity. He challenges the sufficiency of the Government's evidence as to all ten convictions.

To establish that Alas Candray violated the VICAR statute, the Government had to prove that: (1) a RICO enterprise existed; (2) the enterprise was engaged in racketeering

---

[4] As mentioned above, we discuss the remaining murders that the Government charged as overt acts in furtherance of the conspiracy in the VICAR section.

activity; (3) Alas Candray had a position in the enterprise; (4) the defendant committed one of the crimes in the VICAR statute, which includes murder, § 1959(a)(1), and conspiracy to murder and attempted murder, § 1959(a)(5); and (5) Alas Candray's purpose was to maintain or increase his position in the enterprise. *United States v. Jenkins*, 169 F.4th 497, 507 (4th Cir. 2026).

1.

For Alas Candray's role in murdering Mejia, the jury convicted him of conspiracy to commit murder in aid of racketeering activity (Count 2) and murder in aid of racketeering activity (Count 3). Alas Candray claims the Government's proof is lacking, contending that it failed to establish (1) the existence of a plan, and (2) that he participated in the plan.

As to the existence of a plan, the evidence supports Alas Candray's conviction. To be sure, the three cooperating witnesses' accounts of ULS's original plan vary slightly. For instance, while all three witnesses testified that ULS members, including Alas Candray, arrived in Virginia to murder a target identified by ULS leadership, they did not agree on the original target. J.A. 606 (Lozano testifying that ULS targeted "El Gordito"), 809–10 (Garcia testifying that ULS targeted "Flaco" or "Victor"), 913 (Guevara testifying ULS targeted "Gordito" and "Flaco"). But they all did agree that their original target—whoever he was—disappeared, so the group made a new plan: visit a known hang-out spot for a rival gang and murder a member of that gang.

Contrary to Alas Candray's assertion, these are not "inconsistent statements." Opening Br. 60. Instead, they reflect a coherent and consistent narrative: ULS members—

12

including Alas Candray—originally planned on murdering a target identified by their leadership. When that plan fell through, they formed a new plan which led to the murder of Mejia. Thus, a rational factfinder could rely on Lozano's, Garcia's, and Guevara's testimony to conclude that Alas Candray, along with other ULS members, planned to murder Mejia. *Jackson*, 443 U.S. at 319 (holding that a conviction is adequately supported if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

As to Alas Candray's participation in Mejia's murder, the three cooperating witnesses provided ample support for the jury's conclusion. Lozano, who was present during the murder, testified that Alas Candray shot Mejia twice with his 9mm firearm, after which other ULS members attacked Mejia with a machete. And as this Court has observed, "[e]ven an uncorroborated account of a single witness may constitute sufficient evidence." *United States v. Legins*, 34 F.4th 304, 314 (4th Cir. 2022). But even if Lozano's testimony isn't enough *on its own*, the evidence doesn't stop there. The Government also offered the testimony of Garcia and Guevara, who relayed that Alas Candray told them he shot and killed Mejia with his 9mm handgun. What's more, the Government adduced expert testimony that the .45 caliber cartridge cases recovered from Mejia's murder site matched the .45 caliber handgun recovered from Alas Candray's residence. Taken together, this evidence is more than sufficient to sustain Alas Candray's conviction for murder in aid of racketeering activity in connection with Mejia's murder.

Alas Candray's arguments merely nitpick the cooperating witnesses' testimony out of context. *See* Opening Br. 61 (claiming, without a citation to the record, that "Lozano []

13

testified that he encountered [] Mejia on the path not Alas Candray"). More concerning, Alas Candray ignores the evidence placing him at the location where the plan was formed and, later that evening, where Mejia was shot and killed. *See Jenkins*, 169 F.4th at 511 (rejecting arguments challenging Jenkins's conspiracy conviction because his arguments to the contrary challenged the witness's credibility and "ignore[d] evidence placing him at the Railroad when the conspiracy underlying Count 1 was formed"). Alas Candray's minor discrepancies aren't enough to overcome the deluge of evidence against him.

Accordingly, we conclude that the Government adduced more than sufficient evidence to support Alas Candray's convictions related to Mejia's murder.

2.

With respect to Ponce's murder, the jury convicted Alas Candray of conspiracy to commit murder in aid of racketeering activity (Count 5) and murder in aid of racketeering activity (Count 6). Again, Alas Candray disputes the sufficiency of the evidence that he participated in planning or killing Ponce. And again, the evidence belies his arguments.

Lozano testified that Alas Candray invited him to a park, along with Barrera and Martinez, to discuss "possibilities or probabilities that they were going to play." J.A. 642.[5] Lozano arrived at the park, and the group's plan came into focus when Ponce—a "chavala," i.e., "an enemy," like a member of a rival gang, J.A. 962—agreed to meet Barrera in the park and smoke marijuana. Lozano and Barrera planned to drop Alas Candray and Martinez off in a "dark part of" the park, pick Ponce up, and bring her to that same area of the park

---

[5] "[P]lay" is code for saying "that we're going to kill a person." J.A. 642.

14

to kill her. J.A. 644. Once Ponce was at the park, Barrera tried to shoot her but forgot to disengage the gun's safety, so Lozano shot her with a .45 caliber handgun. Then, with the same .45 caliber handgun, Alas Candray and Martinez shot Ponce—in that order. Finally, Barrera disengaged his safety and shot Ponce with his 9mm handgun.

Alas Candray disputes the jury's reliance on this evidence for two reasons. First, he argues that Lozano's testimony that Alas Candray shot Ponce third is contradicted by Vasquez's testimony that he shot Ponce second. In so arguing, Alas Candray misstates the record. Consistent with Lozano's testimony, Vasquez testified that Lozano shot Ponce first and that, at some point after that, Alas Candray also shot her. Far from undermining Alas Candray's convictions, Vasquez's testimony supports that Alas Candray participated in Ponce's murder. And the jury was entitled to credit Lozano's and Vasquez's testimony on this point. *Simmons*, 11 F.4th 270 ("[I]f there are two or more reasonable interpretations of the evidence, the jury decides which one controls.").

Second, Alas Candray emphasizes the lack of physical evidence tying him to the scene. He notes that other ULS members' saliva and fingerprints were tied to a cigarette at the scene and the 9mm handgun referenced in the testimony. But here, the absence of physical evidence is not evidence of physical absence. Lorenzo and Vasquez testified that Alas Candray was involved in planning to kill and killing Ponce—and the jury apparently credited that testimony. *United States v. Devine*, 40 F.4th 139, 146 (4th Cir. 2022) (noting that weighing "witness credibility" "is the sole province of the jury" (cleaned up)). Alas Candray simply ignores evidence that does not support his argument. J.A. 412, 1476–80,

15

2097–98 (testimony that bullets recovered from Ponce's body and from the crime scene were fired from the .45 caliber handgun recovered from Alas Candray's residence).

Therefore, we conclude that the Government adduced sufficient evidence to support Alas Candray's convictions related to Ponce's murder.

3.

Moving on to the plot to kill Flaco, the jury convicted Alas Candray of conspiracy to murder in aid of racketeering activity (Count 8). Again, he contends there was insufficient evidence of his involvement.

Alas Candray drafted a message to MS-13 leadership outlining all of Flaco's infractions—such as "flash[ing] his machete" and being "drugged up with weed, cocaine, and rock"—and requesting "the opportunity to set up a game" with Flaco. J.A. 1924. In line with that message, Melendez testified that MS-13 did not get along with someone named "Flaco," who "dr[a]nk a lot" and "pulled a machete" on a ULS member. J.A 1339–40. As a result, ULS leadership approved the murder of Flaco. Melendez was informed to "keep a lookout" and "let a homeboy know [if he saw Flaco] so that they could carry out a hit." J.A. 1341.

So when Melendez saw Flaco on a bench, he informed Alas Candray of Flaco's location. Alas Candray responded by directing Melendez to "stick a knife into his neck." J.A. 1342. Melendez claimed there were too many people around and did not carry out the order. On a separate occasion, Melendez and Alas Candray saw Flaco while driving through the apartments where he lived and Alas Candray "said that he was going to shoot [Flaco],

16

and then he said that he would pass [Melendez] the gun so that [he] could do the same." J.A. 1342–43. Once again, the plan did not come to pass because Flaco was not alone.

Taken together, Alas Candray's message requesting to target Flaco and Melendez's testimony that he did, in fact, plan Flaco's murder on two occasions is substantial evidence supporting Alas Candray's conviction. *United States v. Rodriguez-Soriano*, 931 F.3d 281, 286 (4th Cir. 2019) ("Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." (cleaned up)).

Alas Candray views the evidence differently, arguing that a separate group of ULS members conspired to murder Flaco: Lozano, Barrera, and Martinez. He points to a WhatsApp messaging chain, where those ULS members discuss the possibility of killing Flaco. But in that conversation, Lozano says to "coordinate with Kibu to see what he says." J.A. 1935. And as Lozano testified, "Kibu is Buky," which is one of Alas Candray's nicknames. J.A. 660. Therefore, viewing the evidence in the light most favorable to the Government, a reasonable factfinder could conclude that Alas Candray was involved in the plot to murder Flaco, such that the three ULS members wanted to coordinate with him. And even if there are multiple plausible interpretations of the exchanges between Lozano, Barrera, and Martinez, we must credit the jury's conclusion that Alas Candray was involved. *Simmons*, 11 F.4th at 270.

Accordingly, we conclude there is sufficient evidence to support Alas Candray's conviction related to Flaco's murder.

17

4.

For his role in murdering Lemos, the jury convicted Alas Candray of conspiracy to commit murder in aid of racketeering activity (Count 9) and murder in aid of racketeering activity (Count 10).

Vasquez testified that he, Alas Candray, and other ULS members gathered in Reston after someone reported seeing "Contratista," who was later identified as Lemos. Alas Candray dictated each person's role in the group's plan, explaining that a member would follow Lemos until an opportunity arose to kill him, while Alas Candray waited at a bus stop near Lemos' apartment. Alas Candray had a 9mm handgun and, while Vasquez was on the phone with him, Vasquez heard shots. After the murder, Vasquez picked Alas Candray up, at which point Alas Candray showed Vasquez his firearm and said "that he had fired all the rounds he had" at Lemos. J.A. 966. Vasquez also testified that Alas Candray said "he shot at [Lemos], and that the [apartment] door was going to close, so [Alas Candray] stepped [his] foot in so the door wouldn't close, then he kept on shooting." J.A. 967–68.

Although Melendez and Lozano were not present for Lemos's murder, they testified that Alas Candray confessed his role in that murder to them. For his part, Melendez testified that Alas Candray gave him a firearm and explained that it "was already stained, that it was the one that [Alas Candray] had used in the death of [Lemos]." J.A. 1353. And Lozano testified that Alas Candray said he killed Lemos using the same 9mm handgun used in Ponce's murder.

18

Alas Candray ignores all of this evidence. Instead, he argues that Lozano, Barrera, and Martinez planned and committed Lemos's murder. His main contention is that Barrera—not Alas Candray—possessed the 9mm handgun used to kill Lemos. But as outlined above, the record does not support that assertion. Giving the Government "the benefit of all reasonable inferences from the facts proven to those sought to be established," Alas Candray's speculation cannot carry the day. *United States v. Savage*, 885 F.3d 212, 219–20 (4th Cir. 2018) (cleaned up).

Consequently, we conclude that the Government adduced sufficient evidence to support Alas Candray's convictions related to Lemos's murder.

5.

With respect to Pineda's murder, Alas Candray was only charged with and convicted of his murder (Count 12)—not conspiracy to participate in his murder. Again, he broadly claims there was insufficient evidence.

Lozano testified that he, Alas Candray, and other ULS members participated in the murder of Pineda, a rival gang member. The group encountered Pineda and another individual, who both appeared drunk, in Reston. Although ULS had approved Pineda's murder, it had not done so for the other individual, so the group let both men leave unharmed. But when Pineda returned alone a few minutes later, all four of the men attacked him and "started kicking him." J.A. 673. Lozano testified that they "almost killed [Pineda] that way," but the final blow came from Alas Candray and another ULS member, who "dropped [a] stone on [Pineda's] head to make sure that he had died." J.A. 673–74.

19

Vasquez testified that he drove Alas Candray to Reston on the night of the murder. He did not join the group, but he received a call that night asking if he wanted to "take part in it," "and if so, to hurry up." J.A. 973. Before Vasquez could reach the group, however, they told him to pick them up at the park. Once the group, including Alas Candray, got into Vasquez's car, Vasquez learned that they killed Pineda "[u]sing rocks," and that "it took two of them to pick up a rock to then throw it on [Pineda]." J.A. 975–76. Although he did not testify that Alas Candray threw the rock, his testimony supports Lozano's firsthand knowledge of Pineda's murder. Taken together, this is sufficient to support Alas Candray's convictions related to the murder. *See Legins*, 34 F.4th at 314.

Alas Candray yet again offers different interpretations of the evidence. He argues, relying on Vasquez's testimony, that he was not present for this murder. But to the extent there is a divergence in Vasquez's testimony and that of Lozano, the jury was entitled to decide which one to believe. *Simmons*, 11 F.4th at 270. Thus, having reviewed his arguments, we decline to disturb the jury's conclusions as to Pineda's murder. Therefore, we conclude there was sufficient evidence to support Alas Candray's conviction as to Pineda's murder.

6.

Finally, for Alas Candray's role in the murder of Avelar, the jury convicted him of conspiracy to commit murder in aid of racketeering activity (Count 13) and murder in aid of racketeering activity (Count 14). Alas Candray once again argues that there is insufficient evidence to support these convictions.

20

Lozano testified that a group of ULS members, including Alas Candray, voted to kill Avelar, who violated ULS's rules. At that point, ULS members began to plan the murder, with Alas Candray and Vasquez choosing a location in a local park. According to Vasquez, he and Alas Candray visited the location "several" times and marked the exact spot with "three Xs on a tree." J.A. 980. Vasquez explained that "the plan was to take [Avelar] to [the park], lying to him, telling him there was going to be a meeting[, and then] take his cell phone and kill him." J.A. 979. The day of Avelar's murder, Alas Candray and Lozano drove Avelar to the park and invited other ULS members. To get Avelar there, they lied and told him that other ULS members would be punished at the park. But once the group arrived at the park, ULS members disclosed that Avelar would be receiving punishment, which would be "thirteen" hits. J.A. 688. The group's plan was to deliver the thirteenth strike to "the rear area of his head," killing him. *Id.*

As for the murder itself, Lozano testified that Alas Candray handed him a bat, and Lozano delivered seven blows before giving the bat to another ULS member. On the thirteenth blow, Avelar lost consciousness. At that point, Alas Candray "placed [a] pocketknife to [Avelar's] neck and stabbed him" repeatedly. J.A. 692. Vasquez testified that, upon his arrival to the park, Alas Candray gave him the knife and told him to stab Avelar. Once Avelar was dead, ULS members dismembered and buried him at the park.

Alas Candray argues that all of this testimony must be discredited because, in his view, it is inconsistent with Melendez's testimony. But even if Alas Candray is correct, we must "assume that the jury resolved all contradictions in testimony in favor of the [prosecution]." *United States v. Contreras*, 149 F.4th 349, 368 (4th Cir. 2025) (quoting

21

*Freitekh*, 114 F.4th at 308). Through that lens, the evidence is plainly sufficient to support Alas Candray's convictions related to Avelar's murder.

We conclude the Government adduced sufficient evidence of Alas Candray's participation in planning to murder and murdering Avelar. Thus, we decline to disturb his VICAR convictions.[6]

\*    \*    \*    \*    \*

To summarize, Alas Candray's arguments all largely follow the same pattern:  he nitpicks or ignores the cooperating witnesses' testimony and identifies immaterial or, at times, imagined inconsistencies. That is simply not enough to "overcome [his] heavy burden" to prevail in advancing sufficiency-of-the-evidence challenges. *United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017) (quoting *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995)). As a result, we affirm the district court's judgment.

III.

Alas Candray next argues that his five mandatory life sentences violate the Eighth Amendment.[7] But his argument on this point is squarely foreclosed by this Court's precedent.

---

[6] For the same reasons that we affirm Candray's VICAR convictions, we conclude there was more than sufficient evidence to support the jury's determination that the murders and attempted murder were overt acts in furtherance of the enterprise. *See Cornell*, 780 F.3d at 630–31.

[7] As noted above, Candray received six life sentences total. Five of those sentences stemmed from his VICAR convictions, while the remaining life sentence stemmed from (Continued)

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. A punishment is cruel and unusual not only when it is "inherently barbaric," but also when it is "disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010). We review de novo whether a sentence contravenes the Eighth Amendment. *United States v. Said*, 798 F.3d 182, 196 (4th Cir. 2015).

We need look no further than *United States v. Contreras*, 149 F.4th 349 (4th Cir. 2025). There, a defendant challenged "the district court's imposition of four mandatory life sentences," arguing that "because he had only recently turned eighteen at the time of the offenses, the imposition of multiple life sentences violate[d] the Eighth Amendment's prohibition on cruel and unusual punishment." *Id.* at 372. This Court summarily rejected that argument, reasoning that "[o]ur governing precedents draw a bright line at the age of eighteen in the imposition of these serious penalties." *Id.* at 373. Although the Supreme Court has repeatedly "expanded protections for children under eighteen," its precedent says "nothing about barring mandatory life without parole sentences for crimes committed by those who are legally adults." *Id.* Thus, the Court affirmed the district court's imposition of a life sentence. *Id.*

For the same reasons articulated in *Contreras*, Alas Candray's argument is meritless.

---

his RICO conspiracy conviction. He does not challenge the RICO-related life sentence on appeal.

23

Alas Candray was convicted of five counts of murder in aid of racketeering activity, which statutorily requires imposition of a life sentence for each count. 18 U.S.C. § 1959(a)(1). By Alas Candray's own admission, he was 21 years old when he committed the earliest murder underlying those convictions. This Court has adopted "a bright line at the age of eighteen in the imposition of these serious penalties," and Alas Candray falls on the constitutionally permissible side of that line. *Contreras*, 149 F.4th at 373. So, his sentence does not violate the Eighth Amendment.

Accordingly, we conclude that the district court did not err in imposing five concurrent life sentences.

IV.

For the reasons outlined above, the district court's judgment is
*AFFIRMED.*

24